In Re: MUNICIPAL REAPPORTION-
MENT OF THE TOWNSHIP OF
HAVERFORD and the Creation of
New Election Districts Within the
Reapportioned Wards.

Appeal of: Patricia Sons Biswanger,
Gary Bogossian, Larry Chrzan, Mi-
chael Curry, Melissa Eastman, Jeffrey
Heilmann, Andy Lewis, James E.
McGarrity, Ronald E. Pogue, Kenneth
Richardson, John Rogers, Jan Marie
Rushforth, Paul Scoles, Conor Quinn,
Daniel Quinn, Michael Stein, and
Robert Trumbull, on behalf of them-
selves and 1,477 qualified electors and
residents of the Township of Haver-
ford.

In Re: Electors and Residents
of Haverford Township.

Appeal of: Patricia Sons Biswanger.

Commonwealth Court of Pennsylvania.

Argued Feb. 2, 2005.

Decided April 29, 2005.

Patricia Sons Biswanger, Bryn Mawr, for appellants.

Lawrence J. Tabas, Philadelphia, for appellee, Township of Haverford.

Francis J. Catania, Media, for appellee, Delaware County Board of Elections.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Patricia Sons Biswanger (Biswanger) appeals two orders of the Court of Com-

mon Pleas of Delaware County (trial court) barring her effort to have a reapportionment plan of Haverford Township (Haverford or Township) set aside. In the first order, the trial court dismissed Biswanger's petition for declaratory and statutory relief to void Haverford's reapportionment because it was untimely filed and invoked the wrong statutory mechanism, 53 Pa.C.S. § 904, for challenging a reapportionment ordinance. In the second order, the trial court dismissed Biswanger's petition for injunctive and statutory relief because it was untimely filed and invoked the wrong statutory mechanism, 53 Pa.C.S. § 906, for challenging an action of the Board of Elections.[1]

Biswanger asserts that the trial court erred because (1) the ordinance that established Haverford's reapportionment violates the standards for such legislation established in the Pennsylvania and U.S. Constitutions, and (2) there is no time limit for lodging a constitutional challenge to an ordinance. In addition, she asserts that because the Township did not comply with the procedural requirements for enacting the ordinance, it is void *ab initio*.

**Background**

Haverford is a township of the first class [2] that covers 9.95 square miles. Haverford is divided into nine wards; each ward elects one commissioner to the Board of Commissioners (Board) that governs the Township. The 2000 census, which was reported on April 1, 2001, revealed that 48,500 persons resided in Haverford, indicating a target population for each ward of 5,389 people. Because the population of Haverford was unequally distributed between its nine wards, reapportionment was required under Section 903 of the Municipal Reapportionment Act, 53 Pa.C.S. § 903.[3]

On December 25, 2003, the Board advertised in the *Delaware County Daily Times* that it was holding a special meeting on December 30, 2003, to discuss the redistricting of the Township. At that meeting, the Board first read a draft of Ordinance P19–2003, which appointed a consulting firm to reapportion the nine wards and provided that the consultant's reapportionment plan, available at the Haverford Municipal Building, was incorporated into the ordinance.[4] On January 2, 2004, the Township advertised the first reading of Ordinance P19–2003 in the *Delaware County Daily Times*. On January 3 and 4, 2004, it again advertised the first reading of the ordinance in the *Delaware County Daily Times*.

On January 12, 2004, at the Board's regularly scheduled meeting, a second reading of Ordinance P19–2003 took place. The ordinance was amended without readvertisement [5] and was enacted by a five to

1. In this second action, Biswanger was joined by four commissioners and twelve electors in the Township purporting to represent 1,477 qualified electors and residents of Haverford whose signatures appeared on "Exhibit A," which was attached to the petition.

2. As such, it is governed by The First Class Township Code, Act of June 24, 1931, P.L. 1206, *as amended*, 53 P.S. §§ 55101–58502.

3. *See* discussion, *infra*, for text of 53 Pa.C.S. § 903.

4. On January 2, 2004, maps that were labeled as "Option 1" and "Option 2" were posted on the Internet. According to the complaint, it was not made apparent that these were the consultant's plans. On January 7, 2004, maps that were labeled as "Option 1" and "Option 2" were placed in the Township Manager's office. Later that day, "Option 1" was relabeled as the "new Plan" and "Option 2" was relabeled as the "Proposed Amendment."

5. The Township's Home Rule Charter General Laws requires readvertising when ordi-

four vote of the Board. Ordinance P19–2003 enacted into law the "Moran/Twardy" reapportionment plan (Moran/Twardy Plan), so named for two Board commissioners. The Moran/Twardy Plan changed the boundaries of Haverford's 37 election districts and reapportioned its nine wards as follows:

| Ward | Total Pop. | Target Pop. | Deviation | Deviation Percentage |
|------|-----------|-------------|-----------|----------------------|
| 1 | 5618 | 5389 | + 229 | + 4.25% |
| 2 | 5576 | 5389 | + 187 | + 3.47% |
| 3 | 5560 | 5389 | + 171 | + 3.17% |
| 4 | 5138 | 5389 | - 251 | - 4.66% |
| 5 | 5399 | 5389 | + 10 | + .19% |
| 6 | 5301 | 5389 | - 88 | - 1.63% |
| 7 | 5105 | 5389 | - 284 | - 5.27% |
| 8 | 5381 | 5389 | - 8 | - .15% |
| 9 | 5420 | 5389 | + 31 | + .58% |
| **Total Range of Deviation** | | | | **9.52%** |

Appellant's Brief at 18.

On January 27, 2004, the four commissioners who did not vote in favor of the Moran/Twardy Plan filed an action, referred to as the "Lewis Action," to invalidate Ordinance P19–2003 on grounds that it was unconstitutional and because its adoption was procedurally irregular. Specifically, they asserted that because there had been substantive amendments to the Moran/Twardy Plan, the ordinance was required to be readvertised under Article III, § 304(C) of the Township's Home Rule Charter General Laws. Counsel for the plaintiffs in the Lewis Action was Biswanger, who acted solely in a representative capacity and not on her own behalf. On February 9, 2004, the plaintiffs withdrew the Lewis Action.

nances are amended in substantive ways. It provides in relevant part as follows:

C. Adoption by Board. Provided that the preceding procedures have been followed and persons interested have been given an opportunity to express their views at a meeting, the Board may adopt the ordinance as proposed or may postpone action until a later meeting, the date of which shall be stated at the advertised meeting. The Board may amend a proposed ordinance before final adoption, *but if an amendment makes any significant substantive change from the ordinance originally advertised, no final action may be taken until the amended ordinance has again been advertised in accordance with Subsection B hereof.* Action on final adoption of an ordinance shall be taken only by an affirmative vote of a majority of the total membership of the Board.

Haverford Home Rule Charter General Laws, Article III, Section 304(C) (emphasis added).

Subsection B of Section 304 provides as follows:

B. Advance advertisement. If approved at first consideration by the Board, the Township Manager shall cause a concise summary of the proposed ordinance to be advertised at least once in one or more newspapers of general circulation in the township, appearing at least seven days before the meeting at which the ordinance will receive further consideration by the Board. The summary shall contain sufficient information to identify the geographical area and/or nature of the ordinance as it would affect the residents or property owners in the township and shall specify the date at which the Board proposes to act further on the ordinance.

Haverford Home Rule Charter General Laws, Article III, Section 304(B).

On May 4, 2004, Biswanger, *pro se,* filed a "Petition for Statutory Relief Pursuant to 53 Pa. Con. Stat. Ann. § 904 and for Declaratory Relief," captioned *In re Electors and Residents of Haverford Township* (§ 904 Petition). Biswanger contended that because Ordinance P19–2003 was enacted two-and-a-half years after the Federal census was officially and finally reported, it was unlawful. She also asserted that the ordinance was void *ab initio* because notice of its pending enactment was not properly given.[6] Finally, her § 904 Petition asserted that the Moran/Twardy Plan violated equal protection and requested the court to replace it with a "Voters' Plan," which was promised to be presented at a hearing on the merits of her petition. A map illustrating how the Voters' Plan would divide Haverford was attached to the § 904 Petition.

The Township filed preliminary objections,[7] denying that there were any procedural or substantive problems with Ordinance P19–2003. It requested a dismissal of the § 904 Petition because it was untimely and invoked the wrong statutory mechanism for challenging a reapportionment ordinance.

By order of August 18, 2004, the trial court sustained the Township's preliminary objections. The Judicial Code gives an individual 30 days after the effective date of an ordinance to challenge the process by which the ordinance was enacted, and the

trial court found that Biswanger failed to meet this deadline. The trial court did not address the Township's demurrer to Biswanger's constitutional challenges, holding, instead, that it simply lacked subject matter jurisdiction. The trial court reasoned that where, as in Haverford's case, reapportionment has been done by legislation, a court may not draw its own plan pursuant to 53 Pa.C.S. § 904.

Thereafter, the Delaware County Board of Elections held a hearing on the proposed redistricting of Haverford that was necessitated by the enactment of Ordinance P19–2003. The Board of Elections declined to hear any constitutional arguments about the validity of the ordinance in this hearing, in which the Township, Biswanger and certain commissioners participated. On November 19, 2004, the Board of Elections petitioned the trial court to approve its recommended election districts, drawn to be consistent with the reapportionment plan in Ordinance P19–2003.

On December 7, 2004, Biswanger, four minority commissioners and twelve electors (collectively Biswanger) filed a "Petition Pursuant to 53 Pa.C.S.A. § 906 and for Injunctive Relief" (§ 906 Petition). Biswanger requested the trial court to deny the petition filed by the Board of Elections and to enjoin the implementation of the reapportionment plan in Ordinance

6. The § 904 Petition asserted that the Board advertised Ordinance P19–2003 in the *Philadelphia Daily News,* instead of the *Delaware County Daily Times,* in order to make the ordinance effective by January 27, 2004, the first day nominating petitions could be circulated for new positions on the Haverford Township Republican Committee.

7. In its preliminary objections, the Township asserted that (1) the trial court lacked subject matter jurisdiction because the Board had enacted a reapportionment plan that left the court without jurisdiction under 53 Pa.C.S.

§ 904 to fashion another plan and (2) the petition failed to state a cause of action because (i) notice of the ordinance was proper, (ii) the law does not prescribe a minimum debate on a proposed ordinance, (iii) there is no remedy for political gerrymandering unless it is extreme, which was not alleged, and (iv) the advertisement was electronically filed in the *Philadelphia Daily News* in order to avoid errors that might occur if it had to be manually filed with the *Delaware County Daily Times.*

P19–2003 because it was unconstitutional and violated 53 Pa.C.S. § 903(b). Biswanger asserted that the Moran/Twardy Plan was vastly inferior to her "Alternative Plan," which would apportion the wards as follows:

| Ward | Total Pop. | Target Pop. | Deviation | Deviation Percentage |
|------|-----------|-------------|-----------|---------------------|
| 1 | 5478 | 5389 | +89 | +1.65% |
| 2 | 5424 | 5389 | +35 | + .65% |
| 3 | 5315 | 5389 | - 74 | - 1.37% |
| 4 | 5424 | 5389 | +35 | + .65% |
| 5 | 5337 | 5389 | - 52 | - .96% |
| 6 | 5348 | 5389 | - 41 | - .76% |
| 7 | 5339 | 5389 | - 50 | - .93% |
| 8 | 5486 | 5389 | +97 | +1.80% |
| 9 | 5396 | 5389 | + 7 | + .13% |
| **Total Range of Deviation** | | | | **3.17%** |

Appellants' Brief at 20. As ancillary relief, Biswanger requested a stay of the implementation of Ordinance P19–2003 because of the various challenges that were pending. The § 906 Petition used the same caption as the Election Board's petition for approval of its proposed election districts.

On December 23, 2004, the trial court dismissed the § 906 Petition as untimely. On that same day, the trial court approved the Election Board's recommendation, officially establishing election districts consistent with the Moran/Twardy Plan enacted in Ordinance P19–2003.

### Appeals

On September 17, 2004, Biswanger appealed the dismissal of her § 904 Petition to the Superior Court of Pennsylvania. On November 10, 2004, in response to Biswanger's Pa. R.C.P. No.1925(b) statement, the trial court issued an opinion in support of its order of August 18, 2004, sustaining the Township's preliminary objections. On January 3, 2005, Biswanger's appeal was transferred to this Court and docketed at No. 4 C.D.2005. The Town-

ship's motion to quash Biswanger's appeal was also transferred to this Court. The motion to quash asserted that because the trial court lacked jurisdiction under 53 Pa. C.S. § 904 to undertake a judicial reapportionment of Haverford, appellate jurisdiction was also lacking.

On December 30, 2004, Biswanger appealed the trial court's denial, or dismissal, of her second petition, the § 906 Petition. This second appeal was docketed at No. 2781 C.D.2004. On January 12, 2004, Biswanger filed a Pa. R.C.P. No.1925(b) Statement, and on January 18, 2005, the trial court issued an opinion in support of its order of December 23, 2004. On January 12, 2004, Biswanger also requested this Court to stay the implementation of Ordinance P19–2003 so that it would not be effective for the 2005 election year.

On January 11, 2005, this Court consolidated Biswanger's appeals and directed that they be considered on an expedited basis.[8] On January 14, 2005, this Court directed that the parties address Biswanger's motion for a stay in their briefs on

---

8. In her brief, Biswanger termed her § 904 Petition the "Procedural Challenge" and her § 906 Petition the "Constitutional Challenge." The argument portion of her brief did not distinguish between the two petitions; accordingly, it is difficult to know how each argument relates to each appeal. Both petitions assert constitutional claims.

the merits of the two appeals. On February 2, 2005, the Court heard argument *en banc,* and on March 2, 2005, this Court denied Biswanger's requested stay.

## Standards for a Municipal Reapportionment Plan

Biswanger contends that Ordinance P19–2003 violates every standard, procedural and substantive, that governs the enactment of a reapportionment plan. Accordingly, she requests that the trial court be directed to conduct a hearing on her claims. It is appropriate, then, that we briefly consider the standards applicable to municipal reapportionment plans.

The Legislature's standards for a local government reapportionment are set forth in the Municipal Reapportionment Act, 53 Pa.C.S. §§ 901–908. Section 903 directs when districts must be redrawn and how they must be redrawn; it states:

**Reapportionment by governing body**

**(a) General rule.**—Within the year following that in which the Federal census, decennial or special, is officially and finally reported, and at such other times as the governing body deems necessary, each entity having a governing body [9] not entirely elected at large shall be reapportioned into districts by its governing body. The governing body shall number the districts.

**(b) Composition of districts.**—Districts shall be composed of compact and contiguous territory as nearly equal in population as practicable as officially and finally reported in the most recent Federal census, decennial or special.

53 Pa.C.S. § 903. This statutory provision tracks the requirements of Article IX, Section 11 of the Pennsylvania Constitution, which states as follows:

Within the year following that in which the Federal decennial census is officially reported as required by Federal law, and at such other times as the governing body of any municipality shall deem necessary, each municipality having a governing body not entirely elected at large shall be reapportioned, by its governing body or as shall otherwise be provided by uniform law, into districts which shall be composed of compact and contiguous territory as nearly equal in population as practicable, for the purpose of describing the districts for those not elected at large.

PA. CONST. art. IX; § 11.

Simply stated, a municipality, whose governing body is not elected at large, must undertake a reapportionment of its election districts after each Federal census. The districts must be "composed of compact and contiguous territory as nearly equal in population as practicable." PA. CONST. art. IX, § 11; 53 Pa. C.S. § 903(b). These standards have been given explication by our appellate courts.

In *Commonwealth ex rel. Specter v. Levin,* 448 Pa. 1, 293 A.2d 15 (1972), our Supreme Court explained what is required for a reapportionment plan to be "compact" and "contiguous." A district is contiguous if a person can go from any point in the district to another point in the district without leaving the district. *Id.* at 17–18, 293 A.2d at 23. Stated otherwise, one glance at the map ought not to reveal any district "islands." Compactness is more difficult to achieve and, thus, there is a "certain degree of unavoidable non-compactness in any apportionment scheme." *Id.* at 18, 293 A.2d at 23. Specifically, a

---

**9.** "Governing body," is defined, *inter alia,* as a "board of township commissioners," such as that which governs Haverford. 53 Pa.C.S. § 902.

"determination that a reapportionment plan must fail for lack of compactness cannot be made merely by a glance at an electoral map and a determination that the shape of a particular district is not aesthetically pleasing." *Id.* at 18, 293 A.2d at 24. Our Supreme Court noted in *Specter* that mathematical models have been developed for measuring geographical compactness, but it did not endorse any of them. A standard for compactness has yet to be announced, and our courts have yet to set aside a municipal reapportionment plan for lack of compactness.

■ What is meant by "as equal as practicable" has also been the subject of prior decisions. As noted by the Pennsylvania Supreme Court in *In re 1991 Pennsylvania Legislative Reapportionment Commission,* 530 Pa. 335, 348, 609 A.2d 132, 138 (1992), there is tension between the separate goals of compactness and equality of population. When in doubt, the separate goal of compactness should be sacrificed before the goal of equality is compromised. Nevertheless, because compactness is a goal, there must be flexibility in the equality standard.

In *Newbold v. Osser, et al.,* 425 Pa. 478, 230 A.2d 54 (1967), the Pennsylvania Supreme Court held that a plan with an average deviation of 4.08% was constitutional under Article IX, § 11. The deviation spread went from +7.8%, for the most populous district, to –6.9% for the least populous, creating a ratio of 1.15 to 1. This distribution satisfied the "as equal as practicable" standard.

■ The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution also requires that state and local governments "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[10] Article I, §§ 1 and 26 of the Pennsylvania Constitution also guarantee equal protection. Our Supreme Court has explained that the protection of the right to vote provided by Article I, §§ 1 and 26 is no greater than the protection provided by the Equal Protection Clause. In *Erfer v. Commonwealth of Pennsylvania,* the Supreme Court held as follows:

We reject Petitioners' arguments that we should declare that the right to vote guaranteed by our Commonwealth's Constitution provides broader protections than those guaranteed by the federal Equal Protection Clause. We come to this conclusion for two reasons. First, to the extent that Petitioner's gerrymandering claim is predicated on the equal protection guarantee contained in Pa. Const. art. 1, §§ 1 and 26, this court has previously determined that this right is coterminous with its federal counterpart. *Love v. Borough of Stroudsburg,* 528 Pa. 320, 597 A.2d 1137 (1991). Second, we reject Petitioners' claim that the Pennsylvania Constitution's free and equal elections clause provides further protection to the right to vote than does the Equal Protection Clause. *Petitioners provide us with no persuasive argument as to why we should, at this juncture, interpret our constitution in such a fashion that the right to vote is more expansive than the guarantee found in the federal constitution.*

10. The standard "as equal and practicable" set forth in Article IX, § 11 of the Pennsylvania Constitution cannot be distinguished from "of [as] equal population as is practicable" required by the Equal Protection Clause of the U.S. Constitution. *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362.

568 Pa. 128, 138–139, 794 A.2d 325, 332 (2002) (emphasis added).

With these principles in mind, we turn to the merits of the arguments raised by Biswanger and by the Township.

## § 904 Petition

Where a municipality cannot, or refuses, to enact a reapportionment, the law provides a remedy in Section 904 of the Municipal Reapportionment Act. It states in relevant part as follows:

> (a) **Petition.** If there has not been a reapportionment by the governing body within the year following that in which the Federal census, decennial or special, is officially and finally reported, a petition, signed by one or more electors who are residents of the entity, may be submitted to the court of common pleas which may then reapportion in accordance with this chapter.

53 Pa.C.S. § 904(a). Using the procedures established in the statute, the court of common pleas, not the legislative body, assumes responsibility for the creation and numbering of legislative districts.[11] This remedy provides a powerful incentive for legislative bodies to act.

The trial court held that once the Board, Haverford's legislative body, acted, the court lacked authority under 53 Pa. C.S. § 904 to reapportion Haverford by judicial order. It found support for this conclusion in *Springfield Township v. Kahn,* 13 Pa.Cmwlth. 393, 320 A.2d 372 (1974).

In *Springfield Township,* this Court considered the validity of a court-appointed commission created under the First Class Township Code[12] to do a reapportionment because three years after the 1970 census there had been no action by the seven township's commissioners. The commission was appointed by the court as a result of a citizen petition; thereafter, the township commissioners passed a resolution to study reapportionment. As a result, the township sought to have the petition dismissed. The trial court denied the request and ordered the commission to proceed with hearings and the filing of its report. We reversed.

Observing that the court-appointed commissioners and the township commissioners could each design a different plan of reapportionment, we concluded that "we would be bound to recognize the reapportionment of the Township Commissioners." *Springfield Township,* 320 A.2d at 377.

---

11. The procedures for a court-drawn reapportionment plan are as follows:

(b) **Appointment of commissioners.**—Upon receiving the petition to reapportion, the court may appoint three impartial persons as commissioners.

(c) **Report to court.**—The commissioners appointed by the court or any two of them shall make a report to the court within the time the court directs and shall include with it a plot showing the boundaries of the present districts and a plot showing the districts as proposed by them, along with pertinent information relating to population and area of the proposed districts.

(d) **Action on report.**—Upon presentation, the court shall confirm the report nisi and shall direct that notice of the filing of the

report shall be given publication once in a newspaper of general circulation stating that exceptions may be filed to the report within 30 days after the report was filed. If no exceptions are filed or if the court dismissed the exceptions, the court shall confirm the report absolutely and issue a decree. The court in its decree shall designate a number for each of the districts. 53 Pa.C.S. § 904(b)-(d).

12. This was before the General Assembly had adopted legislation to implement Article IX, § 11 of the Pennsylvania Constitution. *Springfield Township,* 320 A.2d at 374. The provisions of the First Class Township Code at issue in *Springfield Township* are virtually identical to those in 53 Pa.C.S. § 904.

Thus, we dissolved the court-appointed commission and dismissed the petition. This was done notwithstanding the fact that Springfield's legislative reapportionment was, at best, inchoate. Here, by contrast, Haverford's commissioners had already enacted a reapportionment ordinance by the time Biswanger filed her § 904 Petition.[13]

■ We agree with the trial court's analysis. A § 904 petition is simply not the appropriate remedy where, as here, a citizen seeks to set aside a reapportionment ordinance enacted by a legislative body. Thus, we hold that the trial court properly dismissed the § 904 Petition as an improper way to challenge an existing reapportionment ordinance.

■ Second, the trial court held that Biswanger's procedural challenge to Ordinance P19–2003 was untimely. Section 5571(c)(5) of the Judicial Code, 42 Pa.C.S. § 5571(c)(5), gives an individual 30 days after the effective date of an ordinance to lodge a challenge to the process by which the ordinance was enacted. It states:

[Q]*uestions relating to an alleged defect in the process of enactment or adoption of any ordinance ... shall be raised by appeal or challenge commenced within* 30 *days* after the intended effective date of the ordinance.... As used in this paragraph, the term "intended effective date" means the effective date specified in the ordinance or, if no effective date is specified, the date 60 days after the date the ordinance ... was finally adopted but for the alleged defect in the process of enactment or adoption.

42 Pa.C.S. § 5571(c)(5) (emphasis added).

Because Ordinance P19–2003 was adopted on January 12, 2004, the trial court held that Biswanger's challenge had to be filed on or before March 12, 2004, in order to satisfy the above-recited 30 day statute of limitations. In point of fact, as later recognized by the trial court at the December 22, 2004, hearing, Biswanger actually had 90 days to challenge the "procedural irregularities" surrounding the enactment of Ordinance P19–2003. Because the ordinance did not specify an effective date, 42 Pa.C.S. § 5571(c)(5) specified the effective date to be March 12, 2004, giving an objector until April 12, 2004, to challenge Ordinance P19–2003. Nevertheless, the § 904 Petition was not filed until May 4, 2004, making it untimely and impossible for the trial court to order Ordinance P19–2003 void *ab initio*.[14] Thus, the trial court

---

13. Notably, a reapportionment of Haverford could not be implemented by the Delaware County Board of Elections until June 30, 2002, or until resolution of all judicial appeals governing congressional districts. Section 536(a) of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2600–3591 (Election Code), states in relevant part that

Except as provided in subsection (b), there shall be no power to establish, abolish, divide, consolidate or alter in any manner an election district during the period June 1, 2000, through June 30, 2002, or through resolution of all judicial appeals to the 2002 Congressional Reapportionment Plan, whichever occurs later.

25 P.S. § 2746(a).

14. Biswanger's argument to the contrary is tautological. She argues that Ordinance P19–2003 is void *ab initio* and, therefore, does not have an effective date. First, if she is correct, then 42 Pa.C.S. § 5571(c)(5) has no meaning. Second, she relies upon *Schadler v. Zoning Hearing Board of Weisenberg Township*, 578 Pa. 177, 850 A.2d 619 (2004), which held that a procedural challenge to a land use ordinance could be brought more than 30 days after its effective date. The facts in *Schadler* were egregious because no notice of the ordinance was given and the text was unavailable to the public. Here, Biswanger challenges the quality of the advertising and public availability. Further, *Schadler* was decided before the 2002 amendments to the Judicial Code became effective.

correctly held that it was too late to challenge whether Ordinance P19–2003 was properly advertised; its dismissal of the § 904 Petition on this ground must be affirmed.

## § 906 Petition

The trial court dismissed Biswanger's § 906 Petition as an untimely and unauthorized attempt to disrupt the work of the Board of Elections. It further held that as a constitutional attack on Ordinance P19–2003, the § 906 Petition's request for injunctive relief was barred by the doctrine of laches, noting that Biswanger waited over eleven months to file her complaint.[15] Biswanger rejoins that there is no time limit for challenging the constitutionality of an ordinance and immediate relief was required lest the 2005 elections proceed pursuant to an invalid reapportionment plan. The Board of Elections argues that Biswanger's § 906 Petition was an inappropriate vehicle for challenging its actions, which are governed by the Election

Code and not the Municipal Reapportionment Act. The Township argues that even if Biswanger's § 906 Petition was not an untimely challenge to the constitutionality of Ordinance P19–2003, it can be dismissed on other grounds and, thus, the trial court's order should be affirmed.

■ We consider, first, the argument of the Board of Elections. As noted by the trial court in its January 18, 2004, Opinion, the Board of Elections filed its November 19, 2004, petition under the Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600–3591 (Election Code). Section 504 of the Election Code, 26 P.S. § 2704,[16] authorizes a county board of elections to petition the court for, *inter alia*, the division of a township, ward or election district into two or more election districts, or for the alteration of the boundaries of any election district. In doing its work, a county board of elections merely implements the reapportionment work of the

---

The trial court correctly relied upon our recent holding in *Taylor v. Harmony Township Board of Commissioners*, 851 A.2d 1020 (Pa.Cmwlth.2004). In *Taylor*, we held that even though the township may have failed to strictly comply with the advertising requirements of the ordinance, because Taylor did not raise this point in a timely procedural challenge to the ordinance, the ordinance could not be voided *ab initio* under 42 Pa.C.S. § 5571(c)(5).

15. Honorable Edward J. Zetusky, at the December 22, 2004, hearing, presented a cogent summary of all of the actions and motions filed in this case. Judge Zetusky presided over numerous, and somewhat redundant, motions, pleadings and hearings over the course of a year. He was troubled, understandably, by Biswanger's "eleventh hour" attempt to derail a long and contentious process to implement Haverford's reapportionment for the 2005 election cycle. Notably, the Township's effort to have the reapportionment plan implemented for the 2004 election was denied by the trial court, but the Township did not appeal.

16. It states in relevant part as follows:

The county board of elections may also petition the court for the division or redivision of any township, borough, ward or election district into two or more election districts, or for the alteration of the bounds of any election district, or for the formation of one or more election districts out of two or more existing election districts or parts thereof, . . . accompanying its petition with a map and a verbal description of the boundaries of the proposed new election districts which must have clearly visible physical features . . . . Upon the . . . filing by the board of its report and recommendations . . . the court may make such order for the division, redivision, alteration, formation or consolidation of election districts, as will, in its opinion, promote the convenience of electors and the public interests . . . .

Section 504 of the Election Code, 25 P.S. § 2704.

local governments within the county, and it does not pass judgment on the wisdom or constitutionality of those plans.

■ Here, the Board of Elections revised election districts using Ordinance P19–2003, written descriptions of the wards and precincts, and by-precinct counts of the number of individuals voting in the May 2003, November 2003 and April 2004 elections. It recommended moving census blocks to revise Ward 8, consistent with Section 302 of the Election Code, 25 P.S. § 2642(a).[17] After a hearing, the trial court adopted the recommendations of the Board of Elections.

■ Neither the Election Code nor the Municipal Reapportionment Act authorize a litigant to use a Board of Elections proceeding as the vehicle to challenge the merits of the underlying reapportionment ordinance.[18] The Board of Elections' sole responsibility was to accommodate the reapportionment of Haverford by making changes in voting districts, subject to the trial court's approval. The Election Code and the Municipal Reapportionment Act are separate and distinct statutes, and the trial court properly dismissed Biswanger's effort to use the Board of Elections' proceeding as the vehicle for challenging the constitutionality of Ordinance P19–2003.

■ We are left, then, with the question of whether Biswanger's challenges to the constitutionality of Ordinance P19–2003 were properly dismissed. Biswanger argues that there is no deadline for challenging the constitutionality of reapportionment legislation.[19] The Township counters that because Biswanger did not, and cannot, state an equal protection claim, the trial court's order may be affirmed on other grounds.

Biswanger claims that the districts in Haverford Township could be closer together in population, and, thus, the plan violates the one-person—one-vote doctrine embodied in the United States and Penn-

---

17. It states in relevant part as follows:

The county boards of elections, within their respective counties, shall exercise, in the manner provided by this act, all powers granted to them by this act, and shall perform all the duties imposed upon them by this act, which shall include the following:

(a) To investigate and report to the court of quarter sessions their recommendations on all petitions presented to the court by electors for the division, redivision, alteration, change or consolidation of election districts, and to present to the court petitions for the division, redivision, alteration, change or consolidation of election districts in proper cases.

Section 302 of the Election Code, 25 P.S. § 2642(a). The duties of a board of elections under the Election Code are ministerial and allow for no exercise of discretion. *Shroyer v. Thomas*, 368 Pa. 70, 81 A.2d 435 (1951).

18. Determining the constitutionality of a statute or ordinance is beyond the province of an administrative agency, in any case.

19. Both Biswanger and the Township direct the Court's attention to *In re Upper Chichester Township*, 52 Pa.Cmwlth. 121, 415 A.2d 1250 (1980). Biswanger cites it to support her contention that there is no deadline for filing a § 906 petition to challenge a reapportionment ordinance. The Township cites *Upper Chichester* to support its contention that a § 906 petition that is "in the nature of a petition to intervene" in a board of elections proceeding must be refused if its filing is "unduly delayed." *Upper Chichester*, 415 A.2d at 1253. Indeed, *Upper Chichester* supports both these positions.

To the extent Biswanger's § 906 Petition was presented solely as a petition to intervene, it could be dismissed as untimely, as found by the trial court. However, it also seeks injunctive relief against Ordinance P19–2003 as unconstitutional; it seeks relief beyond having the petition of the Board of Elections denied. Perhaps the § 906 Petition should have been separately docketed, but we cannot say, at this point, that improper docketing, alone, is a basis to dismiss a substantive constitutional challenge to an ordinance.

sylvania Constitutions.[20] The maximum deviation between any two districts in the Moran/Twardy Plan is 9.52%, which is insufficient, the Township argues, to state a prima facie case of discrimination. The Township contends that any state or local reapportionment plan with a maximum deviation of less than 10% enjoys a "safe harbor" from challenges that assert a violation of equal protection. We agree.

The U.S. Supreme Court has established that minor deviations from mathematical equality among legislative districts does not "make out a prima facie case of invidious discrimination under the Fourteenth Amendment *so as to require justification by the State.*" *Gaffney v. Cummings*, 412 U.S. 735, 745, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (emphasis added). The matter considered in *Gaffney* was a reapportionment plan for the Connecticut General Assembly in which the maximum deviation between any two districts totaled 7.8%. This deviation was found too "minor" to make out a *prima facie* violation of the Equal Protection Clause. The Supreme Court explained that

> appellant urges that the population variations among Senate and House districts in the Board plan did not in and of themselves demonstrate an equal protection violation and that the *State was not required to justify them, absent further proof of invidiousness* by appellees.

For several reasons we think the point is well taken and that the District Court erred in holding to the contrary.

*Id.* at 743, 93 S.Ct. 2321 (emphasis added). On the same day *Gaffney* was decided, the Supreme Court decided *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), holding that a 9.9% maximum variation between two districts in a Texas legislative redistricting plan did not make out a *prima facie* case of discrimination. *Id.* at 764, 93 S.Ct. 2332. Thereafter, in *Brown v. Thomson*, 462 U.S. 835, 842–843, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983),[21] the Supreme Court explained that "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." In *Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the Supreme Court again explained that the state need not offer a justification for its legislative apportionment plan unless there is established a *prima facie* case of discrimination.

▮ The law under the Equal Protection Clause is clear: there is a safe harbor for a reapportionment plan where the maximum deviation between two legislative districts falls below 10%.[22] The dis-

20. Biswanger's brief on the constitutional questions was less than pellucid because she did not distinguish between the § 904 Petition and the § 906 Petition, and different facts are pled in each petition. For purposes of the trial court's dismissal of the § 906 Petition, we look to what was pled therein.

21. A plan with population deviations larger than 10% may be valid, but it must be justified by the state. In *Brown*, the Supreme Court found Wyoming's legislative reapportionment statute to be constitutional notwithstanding a maximum deviation of 89%. *Brown*, 462 U.S. at 841, 103 S.Ct. 2690.

22. Biswanger argues that the Equal Protection Clause requires that population be divided between districts with mathematical precision, citing to cases dealing with congressional districts. Biswanger fails to understand that the standard for congressional districts is different than for state and local legislative districts.

In *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the U.S. Supreme Court established a standard of mathematical precision for congressional districts. In doing so, it relied not upon the Equal Protection Clause but upon Article I, § 2 of the U.S.

sent contends that the United States Supreme Court has recently "held" that the 10% safe harbor rule no longer stands, citing to the concurring opinion of Justices Stevens and Breyer in *Cox v. Larios*, —— U.S. ——, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004). Because *Cox v. Larios* is a summary affirmance, not a holding on the merits, it did not, as asserted by the dissent, "reverse" *Gaffney*.

A summary affirmance such as *Cox* represents no more than a decision of the United States Supreme Court not to hear an appeal; as such, *Cox* has limited precedential value. The Supreme Court has noted that "[s]ummary actions, . . . should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). Equally cogent are the observations of former Chief Justice Burger in *Fusari v. Steinberg*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975):

> When we summarily affirm, without opinion, the judgment of a three-judge District Court we affirm the judgment but not necessarily the reasoning by which it was reached. An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument. Indeed, upon fuller

consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established.

*Id.* at 391–392, 95 S.Ct. 533 (Burger, C.J., concurring) (footnote omitted) (citing *Edelman v. Jordan*, 415 U.S. 651, 671, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (wherein the Supreme Court observed that three summary affirmances "are not of the same precedential value as would be an opinion of this Court treating the question on the merits.")).[23]

■■■ The precedential effect of a summary affirmance is, as the dissent concedes, limited to the specific issues raised in the jurisdictional statement presented to the Court. Dissenting Op. at n. 7. *See also Edelman*, 415 U.S. at 671, 94 S.Ct. 1347. The jurisdictional statement submitted to the Supreme Court for review in *Cox* reveals that the constitutional questions presented were not the same as those raised in this case. The appellant in *Cox* queried, *inter alia*, whether a 10% safe harbor existed for a redistricting scheme that favored incumbents of one political party, *i.e.* partisan gerrymandering. *See* Dissenting Op. at 8 n. 7. That particular issue is simply not before us; Biswanger's § 906 Petition raises only the question of one-person—one-vote. Accordingly, the present case does not fall within the "reach and content" of the Supreme Court's summary

---

Constitution, which establishes the rule for calculating the number of representatives for each State. It says nothing about how to draw congressional districts within a State. *Wesberry* has been harshly criticized for its conclusion that Article I, § 2 "lays down the *ipse dixit* 'one person, one vote' in congressional elections." *Wesberry*, 376 U.S. at 18, 84 S.Ct. 526 (Clark, J., dissenting). Justice Harlan also criticized the opinion for confusing population equality principles among states as opposed to district equality within States. *Id.* at 24–25, 84 S.Ct. 526. In *Karch-*

*er v. Daggett*, Justice White criticized *Wesberry's* goal of "unattainable perfection in the equalizing of congressional districts." 462 U.S. 725, 766, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). The dissent apparently believes that *Wesberry* establishes norms for state legislative districts; it does not. Article I, § 2 of the U.S. Constitution is irrelevant to state legislative districts.

23. *Cox*, by contrast, is a single summary affirmance.

affirmance in *Cox*; *Cox* did not eviscerate *Gaffney* and its progeny.

The dissent also draws far too much meaning from the concurring opinion of two justices in *Cox*, who wrote to express their independent views on the meaning of the Court's holding in *Vieth v. Jubelirer*, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004).[24] Justices Stevens and Breyer stated in their concurring opinion that a state apportionment plan that satisfied the 10% rule could be invalidated upon evidence of partisan gerrymandering.[25] Regardless of their views, and contrary to the dissenting view here, the two concurring justices in *Cox* did not speak for the Court, and they did not overrule *Gaffney*, nor could they in a summary affirmance. The dissent glosses over these points.[26]

We believe, given the prior guidance of our Supreme Court, that a safe harbor also exists for equal protection claims brought under the Pennsylvania Constitution. In

*Erfer*, as noted above, our Supreme Court established, in broad terms, the principle that the one-person—one-vote rule receives no greater protection under the Pennsylvania Constitution than under the United States Constitution. It is true that in *Erfer* the Court was considering Article I, §§ 1 and 26 of the Pennsylvania Constitution, not Article IX, § 11. However, there is no persuasive reason why the "as equal as practicable" standard in Article IX, § 11 should be construed differently than the "as equal as practicable" standard embodied in Article I, §§ 1 and 26, as well as in the Equal Protection Clause.[27]

In short, we agree with the Township that so long as the maximum deviation between legislative districts falls below 10%, the plan does not have to be justified because a prima facie case of discrimination cannot be made. The Moran/Twardy Plan effected a maximum deviation be-

---

**24.** *Vieth* addressed the question of whether extreme partisan gerrymandering violated Art. I, § 2 or the Equal Protection Clause and concluded that it did not. The Supreme Court upheld Pennsylvania's congressional redistricting plan in a plurality decision. Even the dissenters in *Vieth* could not agree on a judicially-managed standard by which to strike down "the most blatant violations of a state legislature's fundamental duty to govern impartially." 541 U.S. at 340, 124 S.Ct. at 1813 (Stevens, J., dissenting).

**25.** Justices Stevens and Breyer dissented in *Vieth* and, by their concurring opinion in *Cox*, apparently, seek to invite more partisan gerrymandering cases. In the absence of judicially-managed standard for evaluating extreme partisan gerrymandering, the invitation is fraught with uncertainties for litigants and the courts.

**26.** The dissent draws too much meaning from Justice Scalia's dissenting opinion in *Cox*. Justice Scalia would have granted the appeal to reverse the three-judge panel because the Court had just determined in *Vieth* that partisan gerrymandering cases are non-justiciable.

He also stated his view that the 10% safe harbor rule established in *Gaffney* should not be set aside where partisan gerrymandering is asserted. Justice Scalia did not opine that *Gaffney* was overruled but, rather, that the District Court overlooked *Gaffney* to create an exception for partisan gerrymandering cases.

**27.** The dissent notes that Article I, §§ 1 and 26 of the Pennsylvania Constitution do not contain the words "as equal as practicable." This is true. Neither can these words be found in the Equal Protection Clause of the U.S. Constitution. Nevertheless, in *Reynolds*, 377 U.S. at 577, 84 S.Ct. 1362, the U.S. Supreme Court held that the Equal Protection Clause requires legislative districts to be as equal in population "as is practicable." In *Erfer*, 568 Pa. at 138–139, 794 A.2d at 332, the Pennsylvania Supreme Court held that the equal protection requirement in Article I, §§ 1 and 26 of the Pennsylvania Constitution provides protection to the right to vote no greater than that provided by the Equal Protection Clause of the U.S. Constitution. In sum, the "as equal as practicable" is a bedrock principle of equal protection, state and federal.

tween districts of 9.52%. Biswanger's claim that Ordinance P19–2003 violates the Equal Protection Clause and Article IX, § 11 of the Pennsylvania Constitution lacks merit, and her § 906 Petition was properly dismissed.

■ However, Biswanger's § 906 Petition asserts other substantive problems with Ordinance P19–2003. It asserts that the ordinance violates the Township's Home Rule Charter because it does not properly account for "distinctive geographical boundaries." § 906 Petition at ¶ 22. Similarly, the petition alleges that the districts reapportioned in Haverford are not sufficiently compact and contiguous and, certainly, not as pleasing to the eye as the proposed Alternate Plan.

■ The Supreme Court rejected a compactness challenge in *Specter* because appellants offered no "concrete or objective data" to support their claim that the districts were not compact. *Specter*, 448 Pa. at 19, 293 A.2d at 24. "Conclusory assertions" of non-compactness do not suffice. *Id.* Further, an objector has the burden of proving a plan unconstitutional, which burden is not satisfied by establishing that there exists an "alternative plan which is 'preferable' or 'better,' but rather that the final plan ... fails to meet constitutional requirements." *In re 1991 Pennsylvania Legislative Reapportionment*

*Commission,* 530 Pa. 335, 343, 609 A.2d 132, 136 (1992).

■ Biswanger's § 906 Petition lodges only bald assertions of non-compactness and the existence of a "preferable alternative," namely hers.[28] She may have a better plan, but this does not state a cause of action for setting aside an ordinance on constitutional grounds under *In re 1991 Pennsylvania Legislative Reapportionment Commission, supra.* Likewise, the argument that her plan, *i.e.,* the Alternate Plan, "looks better" also does not a cause of action state.[29] Biswanger was required to plead objective reasons why the plan adopted in Ordinance P19–2003 was not compact, and she failed to do so. Similarly, she failed to identify, with any specificity, at what point the Moran/Twandy Plan failed to follow "distinctive geographical" features in Haverford, as required in the Home Rule Charter.

■ Pleading inadequacy should be addressed by preliminary objections. The Township had filed neither a demurrer nor a motion for a more specific pleading by the time Biswanger's § 906 Petition was dismissed. Indeed, the Township's deadline for filing had not yet expired on December 23, 2004, when the § 906 Petition was dismissed. Because pleading deficiencies are not a ground for dismissal, we

---

**28.** Biswanger's brief argues that Haverford's reapportionment violates objective measurements of compactness: the perimeter test and the Schwartzberg Test (measuring dispersion-compactness). These facts were not pled. Somewhat inconsistently, Biswanger's brief acknowledges that the Township's enacted reapportionment plan may satisfy the Schwartzberg Test.

**29.** Biswanger also terms the Alternate Plan the "Computer Driven Plan," as if any reapportionment plan could be designed without the assistance of computers. In fact, by instructing their consultants to design a plan as close as possible to the prior apportionment plan, the four minority commissioners gave a direction that was not neutral. Their political goal was to preserve the *status quo.* The enactment of an apportionment plan is, as the trial court correctly observed, a legislative act, and we do not accept the premise that a new plan of apportionment should seek to adhere to the prior legislative plan of apportionment. To so limit a legislative body would allow an earlier legislative body to impose its views upon a successor, which is inappropriate and undemocratic. The essential point is that reapportionment is a legislative, not a judicial, function.

must vacate the trial court's order dismissing the § 906 Petition with respect to the claims [30] that Ordinance P19–2003 is constitutionally infirm because its districts are not compact and contiguous and do not incorporate distinctive geographical features in Haverford. We are constrained to remand, but do so recognizing the daunting challenge presented by this remand. To resolve the factual question of "compactness" will likely require both sides to engage experts,[31] whose task will be complicated by the absence of established standards for judging whether a district's compactness passes constitutional muster. It is noteworthy that no objector in the history of Pennsylvania reapportionment litigation has ever succeeded in setting aside a reapportionment on these grounds.

### Conclusion

For these reasons, we affirm the trial court's order dismissing the § 904 Petition. We affirm in part and vacate in part the trial court's order dismissing the § 906 Petition. Specifically, the claims in the § 906 Petition asserting violations of the geographical boundaries standard in the Home Rule Charter and violations of the compact and contiguous standard in Article IX, § 11 of the Pennsylvania Constitution are remanded to the trial court for further proceedings consistent with this Opinion.

President Judge COLINS concurs in the result only.

**30.** We do not say that a § 906 Petition is a proper vehicle for asserting a violation of the Haverford Home Rule Charter. This question can be addressed upon the filing of a responsive pleading, whether in the form of preliminary objections or an answer, by the Township.

**31.** *In re 1991 Pennsylvania Legislative Reapportionment Commission,* 530 Pa. at 343, 609

### ORDER

AND NOW, this 29th day of April, 2005, the order of the Court of Common Pleas of Delaware County dated August 18, 2004, at No. 4 C.D.2005, is affirmed. The order of the Court of Common Pleas of Delaware County dated December 22, 2004, at No. 2781 C.D.2004, is affirmed in part and vacated in part, and the matter is remanded for further proceedings consistent with the attached Opinion.

Jurisdiction relinquished.

### DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority's holding that there continues to be a "safe harbor" for a reapportionment plan where the total range of population deviation between any state and local district falls below 10%. I believe that holding is at variance with the Equal Protection Clause of the United States Constitution as that provision is now being applied by the United States Supreme Court, as well as in direct violation of the express provisions of the Pennsylvania Constitution and the Municipal Reapportionment Act.

Boiling the facts down to their essence, in this case, Patricia Sons Biswanger (Objector) challenged the reapportionment plan of Haverford Township to reapportion its nine wards and change the boundaries of the Township's 37 election districts. The reapportionment plan had a total range of deviation of 9.52% and by ordinance was enacted into law.[1] Objector

A.2d at 136, teaches that even if the trial court should find Biswanger's Alternate Plan more compact, it does not follow that the plan enacted in Ordinance P19–2003 was constitutionally infirm.

**1.** While the majority states that 25 P.S. § 2600–3591 precluded the Election Boards from making changes to the election districts until June 30, 2002, or until a resolution of all

brought several actions before the trial court arguing, among other things, that the plan was unconstitutional both because of the deviation and because it was not compact and contiguous. She also presented an alternative plan with a total range of deviation of 3.17% which she argued was more compact and contiguous. The trial court dismissed her appeal on procedural issues[2] without hearing her constitutional arguments, including that the reapportionment plan violated equal protection or the one-person, one-vote doctrine embodied in the United States and Pennsylvania Constitutions, and that the ordinance violated the Township's Home Rule Charter because it did not properly account for distinctive geographical boundaries and the districts that were reapportioned were not compact and contiguous.

While the majority remands the matter to the trial court for the limited purpose of hearing Objector's constitutional challenge to determine whether the reapportionment plan is "constitutionally infirm because its districts are not compact and contiguous and do not incorporate distinctive geographical features," the majority dismisses Objector's constitutional challenge that the Township plan was unconstitutional under both the federal and Pennsylvania Constitutions because the total range of population deviation in the reapportionment plan—9.52%—was under 10%, and under its interpretation of *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and *Erfer v. Commonwealth of Pennsylvania*, 568 Pa. 128, 794 A.2d 325 (2002), any plan that has a deviation of 10% or less "enjoys a 'safe harbor' from challenges that assert a violation of equal protection." (Majority opinion at 21.) I respectfully dissent because there can no longer be a "safe harbor" for federal constitutional purposes because *Gaffney* has been reversed, and there was never a "safe harbor" under Article 9, § 11 of the Pennsylvania Constitution, to which *Erfer* does not address or even remotely apply.

Under the federal constitution, as interpreted by the United States Supreme Court, there is a dichotomy between the permitted deviation in population between congressional districts and deviations between districts involving state and local offices. Under Article I, Section 2 of the United States Constitution,[3] the standard

appeals had occurred, nothing under that provision of the Election Code has anything to do with the Township's duties and obligations under the Municipal Reapportionment Act which requires it to reapportion the Township within one year following the federal census.

2. The trial court found and the majority agrees that a challenge to the ordinance's enactment had to be made within 90 days. In doing so, it relies on 42 Pa.C.S. 5571(a)(5), which provides, in relevant part:

[Q]uestions relating to an alleged defect in the process of enactment or adoption of any ordinance, resolution, map or similar action of a political subdivision .... shall be raised by appeal or challenge commenced within 30 days after the intended effective date of the ordinance, resolution, map or similar action. As used in this paragraph, the term "intended effective date" means the effective date specified in the ordinance,

resolution, map or similar action or, if no effective date is specified, the date 60 days after the date the ordinance, resolution, map or similar action was finally adopted but for the alleged defect in the process of enactment or adoption.

However, by its very language, that section only provides limitations to questions relating to alleged defects in the process of enactment or adoption of an ordinance and does not govern substantive challenges such as those that were brought here. If the majority's interpretation was correct and if a challenge to an ordinance prohibiting speech on the public street was not timely brought within 30 or 90 days, as the case may be, any challenge would be forever barred.

3. Article I, Section 2[3] of the United States Constitution provides the following:

Representatives and direct Taxes shall be apportioned among the several States

for voting districts for congressional districts is to be as equal in population as possible. *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). While some deviations appear to be permitted, even the most minor deviations have to be supported or they are struck down. *See Vieth v. Commonwealth of Pennsylvania*, 241 F.Supp.2d 478 (2003).

However, while the federal courts have been unbelievably strict with deviations in federal population deviations involving congressional districts, federal courts have traditionally given much more leeway to deviations contained in state and local reapportionment plans under the Fourteenth Amendment to the United States Constitution which applies to state and local offices.[4] The "safe harbor" that the majority relies on was created in *Gaffney* where

the Supreme Court held that deviations of less than 10% are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney*, 412 U.S. at 745, 93 S.Ct. 2321. Essentially, the majority's position is that even though it is shown that another plan is practical that would have a smaller deviation,[5] not to mention would be more compact and contiguous, because the Township's plan's deviation is less than 10%, it is within a "safe harbor" created by *Gaffney* and cannot be challenged.[6] I disagree because a "safe harbor" no longer exists.

In *Cox v. Larios*, —— U.S. ——, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004), the United States Supreme Court has recently held, albeit in a summary affirmance,[7] that

---

which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse [sic] three, Massachusetts eight, Rhode Island and Providence Plantations one, Connecticut five, New York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

4. In extraordinary situations, the Supreme Court has in the past upheld extraordinary deviations. *See Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (upholding an 89% deviation because of state historical and constitutional interests in Wyoming.)

5. In this case, the two plans at issue are presented below:

| Ward | Alternative Plan | Moran/Twardy Plan |
|---|---|---|
| 1 | +1.65% | +4.25% |
| 2 | + .65% | +3.47% |
| 3 | - 1.37% | +3.17% |
| 4 | + .65% | - 4.66% |
| 5 | - .96% | + .19% |
| 6 | - .76% | - 1.63% |
| 7 | - .93% | - 5.27% |
| 8 | +1.80% | - .15% |
| 9 | + .13% | + .58% |
| RANGE | 3.17% | 9.52% |

6. While often cited for the proposition that it creates a safe harbor, *Gaffney* only queries what would happen if an alternative plan was proposed that offered a *fraction* of a percentage less or was *marginally* better than the original plan offered.

7. The precedential effect given to summary affirmances was set forth in *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). The United States Supreme Court gathered the law on summary adjudications and, while doing so, underscored the tasks of lower courts. It stated that:

The District Court erred in believing that our affirmance in Salera adopted the reasoning as well as the judgment of the three-judge court in that case.... *Hicks v. Miranda* (citation omitted) held that lower

courts are bound by summary actions on the merits by this Court, but we noted that *"[a]scertaining the reach and content of summary actions may itself present issues of real substance."* (Citations omitted.) Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below.

"When we summarily affirm, without opinion, ... we affirm the judgment but not necessarily the reasoning by which it was reached. An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument." (Footnote omitted.) *Fusari v. Steinberg*, 419 U.S. 379, 391–392, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975). (Burger, C.J., concurring).

Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.... Summary actions ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved. *Id.* at 176, 97 S.Ct. 2238. (Emphasis added.)

In a concurring opinion, Justice Brennan set forth what analysis had to be done to rely on summary affirmances:

The Court by not relying on our summary affirmance in *Tucker v. Salera*, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), and *Auerbach v. Mandel*, 409 U.S. 808, 93 S.Ct. 55, 34 L.Ed.2d 69 (1972), effectively embraces that view, and vividly exposes the ambiguity inherent in summary dispositions and the nature of the detailed analysis that is essential before a decision can be made whether it is appropriate to accord a particular summary disposition precedential effect. After today, judges of the state and federal systems are on notice that, before deciding a case on the authority of a summary disposition by this Court in another case, they must (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same and, if they were, (b) determine that the judgment in fact rests upon decision of those questions and not even

arguably upon some alternative nonconstitutional ground. The judgment should not be interpreted as deciding the constitutional questions unless no other construction of the disposition is plausible. In other words, after today, "appropriate, but not necessarily conclusive, weight" is to be given this Court's summary dispositions. *Id.* at 179–180, 97 S.Ct. 2238. *See also* concurring opinion by Justice Stevens in *Mississippi Republican Executive Committee v. Brooks*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984) citing *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). (This Court has determined that summary affirmances "reject the specific challenges presented in the statement of jurisdiction.")

To gauge *Cox's* precedential authority is to mark out the "reach and content" of that summary affirmance. *See Delta Air Lines, Inc. v. Kramarsky*, 650 F.2d 1287, 1295 (2d Cir.1981), *aff'd in part and vacated in part*, 666 F.2d 21 (1981), aff'd in part, vacated in part and remanded sub nom.; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) ("In attempting to apply the rule resulting from ... a summary decision ... lower courts must undertake a careful analysis of the precise 'reach and content' of the Supreme Court's action.") *See* generally, Note, "Precedential Effect," supra, 61 Va.L.Rev. at 141 ("In *Hicks [v. Miranda]* the directive to consider carefully the 'reach and content' of the earlier decision, and to determine 'what issues had been properly presented ...' had been banished to a footnote. In *Mandel*, it became the focal point....") The most important component of that determination is if the issue was squarely raised in the statement of jurisdiction.

In this case, the Jurisdictional Statement lists as four Questions Presented for the Supreme Court's review:

I. Whether a state redistricting plan with a total deviation of less than 10% may be held unconstitutional, where there is no evidence of invidious discrimination, based upon a court's determination that a better plan with smaller deviations could be drawn?

II. Whether a state redistricting plan may be held unconstitutional because incumbents of one political party were treated more favorably than those of another political party?

III. Whether a state court redistricting plan may be held unconstitutional where

as far as state or local constitutional reapportionment claims are concerned, there is no "safe harbor" if 10% or less is met. In *Cox*, the Supreme Court affirmed the U.S. District Court for the Northern District of Georgia's [8] judgment that Georgia's legislative reapportionment plans for the State House of Representatives and Senate that had less than 10% deviation, read in that portion of its opinion titled "Traditional Redistricting Criteria," violated the "one-person, one-vote" principle of equal protection because there was no justification for that deviation. Justice Stevens, joined by Justice Breyer in a concurring opinion, stated:

minor population deviations are related to historic regional factors, and there is no evidence of invidious discrimination?
IV. Whether the district court's decision in this case is clearly erroneous in finding Georgia's redistricting plans unconstitutional where the deviations were minor and there was no evidence of invidious discrimination, simply because plans with smaller deviations could have been drawn?
There is no doubt that the issue of whether there existed a "safe harbor" of 10% was squarely before the Court and was within the "reach and content" of the summary affirmance. This is confirmed not only by Justice Stevens' concurring opinion, but by Justice Scalia's dissenting opinion as well, which bemoans that as a result of the decision, "safe harbors" no longer exist.
In response, ignoring the length of this footnote, the majority says that the dissent glosses over that two dissenting justices neither specifically overrule *Gaffney* nor do they speak for the entire Supreme Court. The dissent recognizes that concurring justices' opinions normally do not speak for the court, but even the majority has to recognize that the concurring opinion appears to do both when it interprets the impact—"the reach and content" of the summary affirmance—when it stated "[i]n challenging the District Court's judgment, appellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than ten percent, within which districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation." 124

In challenging the District Court's judgment, appellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than ten percent, within which districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation. After our recent decision in *Vieth v. Jubelirer*, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), the equal population principle remains the only clear limitation on improper districting practices, and we must be careful not to dilute its strength.

S.Ct. at 2807. None of the majority in *Cox* objected to that concurring justice's statement to the effect of the summary affirmance. Contrary to the majority statement that Cox is simply inapplicable because it dealt with partisan gerrymandering, after the sentence previously quoted, the concurring justice made it clear that partisan gerrymandering was not before the Court when it stated "Appellees alleged [before the district court] that the House and Senate plans were the result of an unconstitutional partisan gerrymander. The District Court rejected that claim ... Appellees do not challenge that ruling, and it is not before us." *Id.* at 2808.

In response to the dissent, the majority also says that the jurisdictional statement raised in *Cox* was not the same issue raised in this case because in *Cox*, the claim was based on partisan gerrymandering. Aside that that was not what the concurring justices thought was before the court, the pertinent provisions of the jurisdictional statement make no reference to partisan gerrymandering, assume no invidious discrimination and present the question of whether there exists a "safe harbor." Because the "reach and content" of the summary affirmance in *Cox* clearly wipes out the 10% "safe harbor," the Township has to provide what the deviation is—as small as practicable, taking into consideration that the districts also have to be as compact and contiguous.

8. *See Larios v. Cox*, 300 F.Supp.2d 1320 (N.D.Ga.2004).

*Id.* at 2808. For the United States Supreme Court to no longer allow a "safe harbor" is understandable because it is now "practicable" for there to be much smaller deviations in districts because it is now much easier to manipulate the census data used in apportioning districts due to technological advances that have occurred since 1973. What used to take hours to hand-calculate when shifting census tracts can now be calculated in seconds with computers. What the Supreme Court seems to require is that deviations, while permitted, now have to be justified as the smallest ones "practicable."

Even if there still existed a "10% safe harbor" that automatically would withstand challenges brought under the Fourteenth Amendment, no such safe harbor exists anywhere in the language of the Pennsylvania Constitution or the Municipal Reapportionment Act, both of which address the manner by which local governments are to redistrict. Article 9, § 11 of the Pennsylvania Constitution provides the following regarding the reapportionment of local municipalities:

> Within the year following that in which the Federal decennial census is officially reported as required by Federal law, and at such other times as the governing body of any municipality shall deem necessary, each municipality having a governing body not entirely elected at large shall be reapportioned, by its governing body or as shall otherwise be provided by uniform law, into districts which *shall be composed of compact and contiguous territory as nearly equally in population as practicable,* for the purpose of describing the districts for those not elected at large. (Emphasis added.)

The language of this provision was incorporated into Sections 903(a) and (b) of the Municipal Reapportionment Act which provide:

> (a) **General rule.** Within the year following that in which the Federal census, decennial or special, is officially and finally reported, and at such other times as the governing body deems necessary, each entity having a governing body not entirely elected at large shall be reapportioned into districts by its governing body. The governing body shall number the districts.

> (b) **Composition of districts.** Districts shall be composed of compact and contiguous territory as nearly equal in population as practicable as officially and finally reported in the most recent Federal census, decennial or special.

The majority's position would require those provisions of the Pennsylvania Constitution and the Municipal Reapportionment Act to be read as providing that anything less than a 10% deviation is presumed to be as nearly equally in population as practicable when nothing in the language of either provision even suggests such safe harbor. The majority states this interpretation is required because in *Erfer,* our Supreme Court held that the Pennsylvania Constitution does not provide any more protection in reapportionment cases than the Equal Protection Clause, and because it believes a "safe harbor" still exists under the Equal Protection Clause, then there is a safe harbor under the Pennsylvania Constitution.

What the majority ignores is that *Erfer* only involved what rights were guaranteed under Article 1, §§ 1 and 26 of the Pennsylvania Constitution, which are the provisions that serve as the basis for creating equal protection rights under the Pennsylvania Constitution, and free and equal election provisions contained in Article 1,

§ 5 of the Pennsylvania Constitution [9] together give no more protection than the federal equal protection. The constitutional provision involved here is Article 9, § 11 of the Pennsylvania Constitution, as well as the Municipal Reapportionment Act, both of which specifically deal with reapportionment which was not involved in any way in *Erfer*.

In response to the dissent, while acknowledging that in *Erfer*, our Supreme Court was only considering Article 1, §§ 1 and 26 when it stated our version of equal protection does not provide any more protection in reapportionment cases than the Equal Protection Clause, the majority, bootstrapping its interpretation, then goes on to state that there is no "persuasive reason why the 'as equal as practical' standard in Article 9, § 11 should not be construed standard rather than the as equal as practicable standard **embedded** in Article 1, §§ 1 and 26." (Emphasis added.) However, it does not explain where it is embedded; nowhere is the phrase "as equal as practical" contained in either of those provisions. Ignoring that the general never controls the specific, what the majority ignores is that Article 9, § 11, however, is very different than the equal protection clause, and there are a host of persuasive reasons why they should not be interpreted the same, the most persuasive

being that the Pennsylvania electorate adopted a constitutional provision that provided as "as equal as practical," not one that said "as equal as practicable above ten percent."

Accordingly, I would follow the plain language of Article 9, § 11 of the Pennsylvania Constitution and the Municipal Reapportionment Act and hold that while the objecting party challenging the plan has the burden of proving that the districts under the reapportionment plan are not compact and nearly equal in population as practicable, once it makes out its burden, the governmental entity cannot merely defend that there is a safe harbor under the Pennsylvania Constitution or the Municipal Reapportionment Act, even if the "safe harbor" continues to exists if the action was brought under the Fourteen Amendment.

Finally, when remanding for the limited purpose of determining whether districts are compact and contiguous and do not incorporate distinctive geographical features, the majority in *dicta* states that it is constrained to remand to determine whether the district is compact, stating "that no objector in the history of Pennsylvania reapportionment litigation has ever succeeded in setting aside a reapportionment on these grounds." In other words,

---

9. Article 1, Section 1 of the Pennsylvania Constitution provides:

> § 1. **Inherent rights of mankind.**
> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Article 1, Section 26 of the Pennsylvania Constitution provides:

> § 26. **No discrimination by Commonwealth and its political subdivisions.**
> Neither the Commonwealth nor any political subdivision thereof shall deny to any

person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

Article 1, Section 5 of the Pennsylvania Constitution provides:

> § 5. **Elections.**
> Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

For an excellent history of the changing constitutional sources for "equal protection" under the Pennsylvania Constitution, *see* Gerney, *Equal Protection in Pennsylvania*, 42 Duquesne L.Rev. 455 (2004).

give objectors a fair trial and then hang them. I believe that all of the language of Article 9, § 11 of the Pennsylvania Constitution and the Municipal Reapportionment Act should mean something, and we should embrace the electors' and the legislators' wishes when they adopted and enacted those provisions, particularly Article 9, § 11 of the Pennsylvania Constitution and the Municipal Reapportionment Act requiring that districts be compact and contiguous.

For above reasons, I respectfully dissent.

Judge SMITH–RIBNER joins.