524 A.2d 1083

In Re: Petition of the Board of Directors of the Hazleton Area School District To Change (Reapportion) an Approved Plan Which Established Nine Regions for Election of Directors Within the District. Valley Education Association, Appellant.

Argued April 21, 1987, before Judges CRAIG and DOYLE, and Senior Judge BARBIERI, sitting as a panel of three.

*Clifford A. Rieders,* with him, *Simonne N. Roy, Rieders, Travis, Mussina, Humphrey & Harris,* for appellant.

*James S. Palermo,* with him, *James A. Kelly* and *David L. Glassberg,* for appellees.

OPINION BY JUDGE DOYLE, May 1, 1987:

This is an appeal by the Valley Education Association (Association) from an order of the Court of Common Pleas of Luzerne County that adopted a reapportionment plan submitted to the trial court by the Board of Directors of the Hazleton Area School District (District) pursuant to the provisions set forth in Section 303 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §3-303 (School Code).

Fortunately, a detailed description of the geographical boundaries of the plan is unnecessary. Suffice it to say that because of major population shifts within the confines of the school district boundaries, the 1967 nine-region plan was no longer satisfactory and was probably unconstitutional. Accordingly, the District, after public notice and hearings at which citizens were invited to comment, devised a plan whereby the District would again be composed of nine regions, but one region admittedly contained a section that did not physically abut the rest of the region.[1] On the bases that this region (Region 7) is not "contiguous" and that the population deviations within the individual regions are unconstitutional in that they are in violation of the "one-man one-vote" principle enunciated by the United States Supreme Court in *Reynolds v. Sims,* 377 U.S. 533 (1964), the Association has objected to the plan.[2]

---

[1] At oral argument counsel for Appellant Association represented to this Court that there was also a noncontiguous portion in a second region (Region 4). Our complete review of the record discloses no evidence from which that statement could be made.

[2] The Association attempted to present two plans at the trial court hearing pursuant to Section 303(b)(2) of the School Code, which provides:

Electors equal to at least twenty-five (25) percentum of the highest vote count for any school director in the last municipal election may develop a plan to elect school

We begin by recognizing, as did the trial court, that where a school district undertakes reapportionment, three criteria must be met. Pursuant to Section 303 of the School Code, "[t]he boundaries of the regions shall be fixed and established in such manner that the population of each region shall be as nearly as equal as possible and shall be compatible with the boundaries of election districts." In addition, there is a third requirement, which appears in Section 502 of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §2702 (Election Code). Section 502 mandates that "[w]hen a school district crosses county lines, the regions of the school district shall be composed of *contiguous* election districts." (Emphasis added.) It is undisputed that the District crosses county lines and includes territory from Luzerne, Carbon, and Schuylkill Counties.

The trial court concluded that the term "contiguous" as used in Section 502 means "in close proximity; or near, though not in contact." Accordingly, it determined

directors from regions or to elect some school directors from regions and some from the school district at large. Plans proposed by electors shall be subject to the same requirements as plans proposed by the Board of School Directors.

There was no showing that the Association met these criteria and hence the District repeatedly and strenuously objected to the trial court's consideration of their plans as alternatives. We agree that there is no evidence that the Association complied with the strictures of Section 303(b)(2) and hence that no other plans were properly before the trial court or are properly before us. *Cf. Consolidation of Election Regions West Branch Area School District*, 104 Pa. Commonwealth Ct. 328, 522 A.2d 667 (1987). We note that *West Branch* also involved reapportionment of a multicounty school district, but the issue of non-contiguous districts in compliance with Section 502 of the Election Code was neither argued nor briefed in that case.

that Section 502 of the Election Code had not been violated. We respectfully disagree.

Although we acknowledge that the term "contiguous" as employed in Section 502 has never been interpreted, we note that that precise term has been interpreted where it appeared in a statute pertaining to annexation of borough and township land. There, as here, the statute itself was free from ambiguity, and the Pennsylvania Supreme Court stated:

> If the Legislature had intended to include in the annexable field such land as was 'nearby' or merely 'close', it would have said so. If contiguity can leap 30 feet, it can leap 300 feet or 30 miles.
>
> . . . .
>
> The universally recognized authority on the English language, the Oxford Dictionary, defines contiguous as 'touching, in actual contact, next in space, meeting at a common boundary, bordering, adjoining; continuous, with its part in uninterrupted contact.'

*Lancaster City Annexation Case (No. 5),* 374 Pa. 546, 548, 98 A.2d 34, 35 (1953). Based upon this reasoning, the *Lancaster* Court concluded that breaks in the annexed area of 244.35 feet by 30 feet and 59.97 feet by 15 feet were noncontiguous and hence violative of the law. Although the record here does not include pertinent and useful facts such as the length of the noncontiguous area and whether any electors even reside there, based upon the analysis in *Lancaster,* we conclude that *any* break in the contiguous physical territory, no matter how small, is unacceptable. We add here that we have searched the record for any indication that compliance with both the two criteria in the School Code and the one criterion in the Election Code would be impossible. There is no such indication. If that were the case, obviously some requirement would have to give way; but since that is not the situation presented to

us, we need not consider it. We also add that the Board's good faith in submitting its plan is not questioned by this Court. We note that the plan has corrected a particularly egregious problem, *i.e.*, the noncontiguity of West Hazleton Borough with the rest of the region to which it has been apportioned at least since 1967, Region 9.[3]

Because of our disposition of this first issue, we are not compelled to reach the question of whether the population within the District has been reapportioned "as nearly equal as possible" or whether the dictates of *Reynolds* (which the Association argues is controlling) have been violated. However, in the interest of judicial economy and in an attempt to provide guidance to the District and trial court, we will briefly discuss this issue because their manner of comparing the percentage variables may be confused by language in certain opinions of the United States Supreme Court dealing with the issue of reapportionment under the aegis of the Equal Protection Clause. The Association argues that under the District's plan the population deviation is impermissible, and cites *Connor v. Finch*, 431 U.S. 407 (1977), which suggests that a prima facie case of unconstitutionality in apportionment is established where a maximum population deviation of more than ten percent exists. *Connor* at 418. *Connor* arose in the context of a reapportionment plan involving a suspect class of citizens in Mississippi and a reapportionment *of state*

---

[3] We further add that although the maps submitted to this Court are of poor quality it appears to us that if the section we believe to be identified as Cranberry is apportioned to Region 7 without violating any election district, and another portion of Region 7 is then made part of an adjoining region (such as Region 4 or Region 9, for example) to balance the population, the entire problem may be corrected, although we would not relish the task of fitting together the territorial jigsaw puzzle.

*legislative districts.* First, there is considerable question as to whether its dictates would be controlling in the apportionment actions *of a local school district.* In *Mahan v. Howell,* 410 U.S. 315 (1973), the Supreme Court stated that state legislative redistricting plans are not to be judged by the more stringent standards that *Kirkpatrick v. Preisler,* 394 U.S. 526 (1969) and *Wells v. Rockefeller,* 394 U.S. 542 (1969) make applicable to congressional reapportionment, but instead by the more flexible equal protection test enunciated in *Reynolds.* The underpinning of this dichotomy is that:

> So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in [the] . . . state legislature.

*Reynolds,* 377 U.S. at 579. In *Mahan,* the Court found that the preservation of political subdivision lines to avoid gerrymandering and to permit voters in those subdivisions a greater voice in the state legislature on local issues were rational state objectives. That being so, a statute mandating the preservation of the boundry lines of the most rudimentary of areas in the election process, the election district (which might be called "precincts" or "divisions") compels a similar conclusion. Likewise, a statute that requires each voting region in a multicounty district to be contiguous to avoid gerrymandering would also appear to be constitutionally permissible.

Second, the Association's asserted population deviation of 16% is the maximum deviation from *total* population equality, not the maximum deviation from the population *norm* of 8,110; that is, the total population (72,992) divided by the number of districts (9). By comparing the population in the district with the greatest

population to the population of the district with the least population, the Association has arrived at a maximum population deviation of 16%, *i.e.,* District 5 with a population of 8,694 compared to District 4 with a population of 7,404. But these population deviations vary from the population *norm* of 8,110 by only 7.2% in the case of District 5, and only 8.7% in the instance of District 4.

In *Mahan* the Supreme Court approved a reapportionment plan of the Virginia General Assembly where the maximum percentage variation was 16.4%, but the most overpopulated district varied from the norm by only 6.8% and the least populated district by only 9.6%. It is apparent therefore, that where a plan reasonably advances a rational state policy, greater deviations are permissible. Furthermore, of the three criteria which must be complied with here, barring compelling circumstances to the contrary, two (contiguous territory and election district boundary lines) are absolutes and only the requirement of population equality is couched in the malleable language, "as nearly as equal as possible."

Finally, because the date of the primary election is so near, we add that in reversing the trial court's order and requiring a new plan, we realize that an extended deadline for the filing of nominating petitions may be necessary and the primary election of School Directors itself may have to be postponed. We may only note in this regard that although a notice of appeal was filed with the trial court on October 22, 1986, neither party in this case petitioned this Court for expedited treatment of this matter until March 17, 1987, *see* Pa. R.A.P. 2313. Accordingly, we refuse to allow the limited time period for plan revision or the costs of a special election to sanction statutory violations where fundamental rights are involved. The order of the trial court is reversed.

ORDER

Now, May 1, 1987, the order of the Court of Common Pleas of Luzerne County in the above captioned matter adopting the District's plan is hereby reversed. This case is remanded to the trial court with directions that it retain jurisdiction and supervise the District's adoption of another plan as expeditiously as possible. The trial court may use its equity powers to extend the deadline for filing nomination petitions and for the holding of a special primary election should such action be necessary and in the best interests of justice. *See Barbieri v. Shapp*, 474 Pa. 613, 379 A.2d 534 (1977) (opinion reported at 476 Pa. 513, 383 A.2d 218 (1978)); *Consolidation of Election Region West Branch Area School District*, 104 Pa. Commonwealth Ct. 328, 522 A.2d 667 (1987). *See also* 42 Pa. C. S. §706 (permitting this Court as an appellate court to remand a matter and require such further proceedings as may be just under the circumstances).

Jurisdiction relinquished.