**In re: PETITION TO REALIGN REGIONAL ELECTION DISTRICTS IN PENNSBURY SCHOOL DISTRICT.**

**Appeal: of Concerned Residents of Pennsbury ("CROP").**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2013.
Decided Nov. 8, 2013.

David J. Truelove, Yardley, for appellant.

Andrew W. Bonekemper, Blue Bell, for appellee.

BEFORE: PELLEGRINI, President Judge, COVEY, Judge and COLINS, Senior Judge.

OPINION BY Senior Judge COLINS.

This is an appeal by an unincorporated association, Concerned Residents of Pennsbury (CROP), from an order of the Bucks County Court of Common Pleas (trial court) approving a school district reapportionment petition filed by the Pennsbury School District Board of School Directors (School Board) pursuant to Section 303 of the Public School Code of 1949 (Public School Code).[1] For the reasons set forth below, we affirm.

The Pennsbury School District (School District) is a school district of the second class with a total population of 71,165 according to the 2010 Census. (November 21, 2012 Trial Court Op. at 1; Hearing Transcript (H.T.) at 156, R.R. at 219a; Petition to Realign Election Districts ¶ 2; Petition for Establishment of a New Representation Plan ¶ 4, R.R. at 7a.) *See also* Section 202 of the Public School Code, 24 P.S. § 2–202. There are four municipalities with a total of 35 election districts [2] in School District: Lower Makefield Township (15 election districts), Yardley Borough (1 election district), Falls Township (18 election districts), and Tullytown Borough (1 election district). (Hearing Exhib-

---

1. Act of March 10, 1949, P.L. 30, § 303, *as amended,* 24 P.S. § 3–303.

2. The term election district refers to the polling place unit or precinct.

it SB–1 Tab 4 at 14, R.R. at 39a; H.T. at 139, R.R. at 202a.)

Section 303 of the Public School Code provides that school boards for school districts of the second class shall be composed of nine directors. 24 P.S. § 3–303(a). The nine directors may be elected at-large, by three regions, by nine regions or by a combination of at-large and three-region voting. 24 P.S. § 3–303(b)(1)–(3). Any changes to the regions or type of plan by which school board directors are elected must be submitted to a court of common pleas for approval. 24 P.S. § 3–303(b)(3). Proposed changes may be submitted by the school board or by petition signed by electors equal to at least 25% of the highest candidate vote in the last school board election. 24 P.S. § 3–303(b)(2), (3).

The School Board has been elected under a three-region plan since the 1960s. (November 21, 2012 Trial Court Op. at 1 n.1; H.T. at 46, 98–99, R.R. at 108a, 161a–162a.) *See also Resident Electors of Pennsbury School Board v. Pennsbury School Board*, 132 Pa.Cmwlth. 362, 572 A.2d 1303, 1304 (1990). The current three-region plan, which has been in place since approximately 1990, consists of a northern region made up of 11 Lower Makefield Township election districts and Yardley Borough (Region 1), a southern region made up of 10 Falls Township election districts and Tullytown Borough (Region 2), and a middle region composed of four Lower Makefield Township election districts and eight Falls Township election districts (Region 3). (November 21, 2012 Trial Court Op. at 1; H.T. at 63, R.R. at 125a; Exhibit SB–1 Tab 4 at 14, 21, R.R. at 39a, 46a; Exhibit SB–1 Tab 3.) Six of the nine current School Board directors are from Lower Makefield Township and three are from Falls Township. (H.T. at 111, 159–60, R.R. at 174a, 222a–223a.)

The 2010 Census showed a significant imbalance between the regions: Region 1 had 40.80% of the total population, Region 2 had 27.26%, and Region 3 had 31.94%. (November 21, 2012 Trial Court Op. at 1; Exhibit SB–1 Tab 4 at 21, R.R. at 46a; Exhibit SB–1 Tab 3; H.T. at 29, 72–73, R.R. at 91a, 134a–135a.) In April 2012, the School Board formed a committee composed of one School Board member from each region to address reapportionment, and that committee directed the School District Superintendent, Business Administrator and Director of Administrative Services to obtain the 2010 Census data and develop recommendations. (H.T. at 29–38, R.R. at 91a–100a.) This group developed two three-region reapportionment proposals, Administration Option No. 1 and Administration Option No. 2 (Administration 2). (H.T. at 75–77, R.R. at 137a–139a; Exhibit SB–1 Tab 4 at 22–33, R.R. at 47a–58a.)

Administration 2 has the following population distribution:

Region 1: 23,928 (33.6% of the total population)

Region 2: 23,273 (32.7% of the total population)

Region 3: 23,964 (33.7% of the total population)

(Exhibit SB–1 Tab 2, R.R. at 25a.) The maximum deviation (449) that any of these three regions has from the ideal population of 23,722 is only 1.89%, and the difference of 691 between the most and least populous regions, Regions 3 and 2, compared to ideal population, is only 2.91%. (November 21, 2012 Trial Court Op. at 2, Exhibit SB–1 Tab 10, R.R. at 61a.) Administration 2, like the existing three-region plan, divides the School District into a northern region that includes all the northernmost election districts (Region 1), a southern region that includes all the election districts in the southern part of the School District (Re-

gion 2), and a middle region between them (Region 3). (Exhibit SB–1 Tab 2, R.R. at 25a.) Administration 2 largely preserves the existing regions; the only change that it made was to transfer two election districts from Region 1 to the adjoining Region 3 and one election district from Region 3 to the adjoining Region 2. (H.T. at 49, R.R. at 111a; Exhibit SB–1 Tab 2, R.R. at 25a; Exhibit SB–1 Tab 4 at 13, 14, 21, 33, R.R. at 38a, 39a, 46, 58a.) No incumbent School District directors would be placed in a different region under Administration 2. (H.T. at 86, R.R. at 148a.) The population deviations between regions in Administration 2 are smaller than in the other proposal considered by the School Board, Administration Option No. 1. (Exhibit SB–1 Tab 4 at 27, R.R. at 52a.)

At a public meeting on May 30, 2012, at which residents of the School District were given the opportunity to comment, the School Board committee selected Administration 2 to recommend to the full School Board. (H.T. at 49, 82–83, R.R. at 111a, 144a–145a.) On June 14, 2012, the School Board voted 8–0 to adopt Administration 2 and seek court approval of Administration 2. (H.T. at 48–49, 82–84, R.R. at 110a–111a, 144a–146a; Exhibit SB–1 Tab 6.)

After the School Board announced that it was considering reapportionment, CROP developed a competing nine-region plan for the School District, Citizen 1, and in June 2012, obtained sufficient signatures supporting that nine-region plan to submit it for court approval. (November 21, 2012 Trial Court Op. at 6; Exhibit CR–9; H.T. at 145–46, 149, 153–54, 157–58, 174–75, R.R. at 208a–209a, 212a, 216a–217a, 220a–221a, 237a–238a; Petition for Establishment of a New Representation Plan Exs. A–C, R.R. at 15a–19a.) CROP did not obtain any signatures supporting any plan other than Citizen 1. (H.T. at 168, R.R. at 231a; Petition for Establishment of a New Representation Plan Exs. A–C, R.R. at 15a–19a.)

Citizen 1 has the following population distribution:

Region 1: 7,941 (11.16% of the total population)

Region 2: 7,982 (11.22% of the total population)

Region 3: 8,127 (11.42% of the total population)

Region 4: 8,032 (11.29% of the total population)

Region 5: 7,876 (11.07% of the total population)

Region 6: 7,920 (11.13% of the total population)

Region 7: 7,740 (10.88% of the total population)

Region 8: 8,008 (11.25% of the total population)

Region 9: 7,539 (10.59% of the total population)

(Exhibit SB–1 Tab 10, R.R. at 61a; Exhibit CR–9.) The maximum deviation (368) that any of these 11 regions has from the ideal population of 7,907 is 4.65%, and the difference of 588 between the most and least populous regions, Regions 3 and 9, compared to ideal population, is 7.44%. (November 21, 2012 Trial Court Op. at 3; Exhibit SB–1 Tab 10, R.R. at 61a.) Three of the nine regions in Citizen 1, Regions 2, 4, and 5, are elongated or wrap partially around other regions. (Exhibit CR 9; Petition for Establishment of a New Representation Plan Ex. B, R.R. at 17a; H.T. at 214, R.R. at 277a.) In one of the regions in Citizen 1, Region 7, one election district is connected to the remainder of the region only at a single point. (Exhibit CR 9; Petition for Establishment of a New Representation Plan Ex. B, R.R. at 17a; H.T. at 202–04, R.R. at 265a–267a.) Citizen 1 would place three incumbent School District directors in Region 1 and two incumbent School District directors in Region 5. (H.T. at 227–28, R.R. at 290a–291a.)

On June 22, 2012, the School Board filed a Petition to Realign Election Districts seeking court approval of Administration 2. On June 29, 2012, CROP filed a Petition for Establishment of a New Representation Plan for electing members of the School Board seeking court approval of Citizen 1. On August 17, 2012, the Honorable Susan Devlin Scott, President Judge of the Court of Common Pleas of Bucks County, held a joint evidentiary hearing on the two competing reapportionment petitions under a joint caption.

At the hearing, the School Board representatives who developed Administration 2 testified that they had considered at-large, combined at-large/three-region and nine-region plans, in addition to three region plans. (H.T. at 37–40, 102–03, R.R. at 99a–102a, 165a–166a.) They rejected at-large and combined at-large/three-region plans on the ground that at-large voting could concentrate power in certain areas of the School District. (H.T. at 38–39, 102, R.R. at 100a–101a, 165a.) In developing the two three-region plans that they presented to the School Board committee, the School Board representatives attempted to preserve the existing regions and transfer only a small number of districts to other regions to correct the population disparities. (H.T. at 49, 74–79, R.R. at 111a, 136a–141a.)

The School Board representatives attempted to develop a nine-region plan but concluded that it would have too much population disparity or "really unusual arrangements" of election districts. (H.T. at 39–40, R.R. at 101a–102a.) They were also concerned that a nine-region plan would more easily become imbalanced by future population changes because even small changes would be significant, given the smaller population of the regions. (H.T. 40–44, R.R. at 102a–106a.) In this regard, the School Board witnesses testified that a proposed 388–home development is planned in the Lower Makefield S–9 election district. (H.T. at 40–42, 80, 127, R.R. at 102a–104a, 142a, 190a.) That election district is in the second largest region of Administration 2 and the largest region of Citizen 1. (H.T. at 127, 209, R.R. at 190a, 272a; Exhibit CR 9; Petition for Establishment of a New Representation Plan Ex. B, R.R. at 17a; Exhibit SB–1 Tab 2, R.R. at 25a.) Additionally, the School Board representatives were concerned that the small size of the regions in a nine-region plan could create problems finding candidates for all the regions or result in uncontested elections in some regions. (H.T. at 68, R.R. at 130a.)

CROP member John McDonnell, who developed Citizen 1 and was one of the two individuals who filed the CROP petition, testified that in his opinion the diversity of the School District would be better served by a nine-region plan than by a three-region plan. (H.T. at 186, 200, 213, R.R. at 249a, 263a, 276a.) He testified, however, that Lower Makefield Township is not homogeneous and that its northern portion is a different type of community than its southern portion. (H.T. at 139–40, R.R. at 202a–203a.) McDonnell admitted that because of the size of election districts, it is very difficult to create a nine-region plan that does not have substantial population disparities. (H.T. at 186, 207–08, R.R. at 249a, 270a–271a.) McDonnell also admitted that under Citizen 1, six of the nine regions could be represented by residents of a single municipality, Falls Township. (H.T. at 201–02, R.R. at 264a–265a.)

Over the School Board's objection, McDonnell testified that he also created a three-region plan, Citizen 2, which had a maximum deviation from ideal population of 54 and a maximum difference between regions of 96, smaller deviations than Administration 2. (Exhibit CR–7; H.T. at 162, 167, 170, R.R. at 225a, 230a, 233a.) The

regions in Citizen 2 consist of a north-central-western region, a south-central-western region, and an elongated region consisting of the northernmost and southernmost parts of the School District, narrowly connected along the east side by single election districts. (Exhibit CR–7.) McDonnell did not contend at the hearing that Citizen 2 should be approved by the court and it was not supported by any petition of electors. (H.T. at 168, 213, 228–29, R.R. at 231a, 276a, 291a–292a.)

On November 21, 2012, following post-hearing briefing, President Judge Scott issued an Opinion and Order approving Administration 2 as the reapportionment plan for the School District. In her opinion, President Judge Scott held that both Administration 2 and Citizen 1 satisfied constitutional and statutory requirements, but concluded that Administration 2 better met the needs of the School District than Citizen 1. (November 21, 2012 Trial Court Op. at 4–11.) On December 20, 2012, CROP filed the instant appeal.

■ Our review in an appeal from an approval of a school district reapportionment plan is limited to determining whether the trial court abused its discretion or committed an error of law and whether its decision is supported by substantial evidence. *In re Petition to Change Representation Plan of Octorara Area School District*, 722 A.2d 767, 769 (Pa.Cmwlth. 1999); *In re Petition to Reapportion School Director Regions of the Chichester School District*, 688 A.2d 1275, 1278 n. 5 (Pa.Cmwlth.1997).

CROP asserts three arguments: 1) that Administration 2 does not satisfy the "one person, one vote" requirement of the Equal Protection Clause of the United States Constitution; 2) that Administration 2 does not satisfy the requirement of Section 303(b)(3) of the Public School Code that the population of voting regions in school board elections be "as nearly equal

as possible;" and 3) that the trial court abused its discretion in approving Administration 2 over its preferred Citizen 1 plan. None of these contentions is valid. Contrary to CROP's assertions, President Judge Scott, in her well-reasoned opinion, correctly applied the law and acted well within her discretion.

*The Federal Equal Protection Clause*

■ The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that the districts by which representatives are elected be "of nearly equal population, so that each person's vote may be given equal weight in the election of representatives." *Voinovich v. Quilter*, 507 U.S. 146, 160–61, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). This "one person, one vote" principle applies to school board elections. *Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 53–56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). Population deviations under 10%, however, are considered minor deviations from mathematical equality and are insufficient by themselves to make out a prima facie case of discrimination under the Equal Protection Clause. *Voinovich*, 507 U.S. at 161, 113 S.Ct. 1149; *Brown v. Thomson*, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *In re Municipal Reapportionment of Township of Haverford*, 873 A.2d 821, 834 (Pa. Cmwlth.2005) (*en banc*). Therefore, where the maximum population deviation in a state or local reapportionment plan is under 10%, the mere fact that greater mathematical perfection is possible is not sufficient to establish a violation of the Equal Protection Clause without proof of discriminatory conduct or a deliberate attempt to increase inequality. *Compare Cox v. Larios*, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004), *summarily affirming* 300 F.Supp.2d 1320, 1325–34 (N.D.Ga. 2004) (state legislative reapportionment plan with 9.98% maximum deviation violat-

ed Equal Protection Clause where there was evidence that plan systematically maximized population deviations by overpopulating certain types of districts and underpopulating others through oddly shaped districts) *with Reapportionment of Township of Haverford,* 873 A.2d at 825–27, 833–36 (local reapportionment plan with 9.52% maximum deviation was constitutional under Equal Protection Clause where there was no evidence of discrimination in its formulation and the only basis for the claim that "one person, one vote" was violated was that another plan had been developed with a lower maximum deviation).

■ The very small population deviations in Administration 2, 1.89% from ideal and 2.91 % between the most and least populous regions, are well under 10% and are therefore plainly minor deviations. CROP did not put forth any evidence of discriminatory intent or conduct in the design or selection of Administration 2. Nothing in the shape of Administration 2's compact and cohesive regions or the method by which the plan was created, the minimization of the number of election districts moved to correct the population imbalance, supports any inference of discrimination. Given the very low population deviations in Administration 2 and the absence of any basis whatsoever to conclude that these minor deviations were discriminatory, the trial court correctly held that Administration 2 satisfies "one person, one vote" requirement of the federal Equal Protection Clause.

CROP argues that because Citizen 2 showed that a three-region plan with even smaller deviations was possible, under *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the School Board was allegedly required to justify Administration 2's population deviations and that it allegedly did not. In *Karcher,* the United States Supreme Court held that a congressional redistricting plan could be unconstitutional even where deviations were under 1%, where alternative plans that had been genuinely proposed had even lower population deviations or greater equality could be obtained through very simple changes. 462 U.S. at 728–29, 739–44, 103 S.Ct. 2653. CROP's claim that Administration 2 is unconstitutional under *Karcher* is invalid for several reasons.

First, as an initial matter, *Karcher's* standard does not apply to this case. *Karcher* was decided under Article 1, § 2 of the United States Constitution, which governs federal congressional reapportionment, not under the Equal Protection Clause, and the Court specifically noted that its higher standard did not apply to redistricting of state offices under the Equal Protection Clause. 462 U.S. at 730–33, 103 S.Ct. 2653. Indeed, this Court has specifically held that Article 1, § 2's higher standard of equality for congressional districts does not apply to state and local reapportionment. *Reapportionment of Township of Haverford,* 873 A.2d at 835 n. 22. Contrary to CROP's contentions, *Mellow v. Mitchell,* 530 Pa. 44, 607 A.2d 204 (1992), *cert. denied sub nom. Loeper v. Mitchell,* 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992), did not apply *Karcher* to state elections. *Mellow,* like *Karcher,* involved congressional redistricting and was decided under Article 1, § 2 of the United States Constitution, not the Equal Protection Clause. 530 Pa. at 47, 50–51, 65, 607 A.2d at 205, 207, 214.

Moreover, even if *Karcher* applied to this local government reapportionment, the conclusion that Administration 2 met federal constitutional standards would still be correct. *Karcher* did not hold that the mere demonstration that it is theoretically possible to develop a plan with lower deviations makes a plan unconstitutional or even shifts the burden to the governmental

body to show legitimate reasons for the choice of a plan with a higher imbalance. Under *Karcher*, justification for a selected plan was required only where the opponent first shows lack of good faith effort to achieve population equality. 462 U.S. at 730–31, 103 S.Ct. 2653. The *Karcher* Court held that this burden can be satisfied where the plan was chosen over more equal alternative proposals, where only minor and simple shifts will reduce inequality, or where the selected plan has bizarre shapes suggesting lack of good faith. 462 U.S. at 738–40, 762–63, 103 S.Ct. 2653. None of those factors are present here. The only plan with lower population deviations than Administration 2 was Citizen 2, and that plan was not presented to the School Board or even submitted in this case as a plan that should be adopted. In addition, Citizen 2 did not achieve reduction in population disparity by minor shifts; it did so only by giving one of the three regions an elongated shape attaching one end of the School District to the other. Administration 2 was the more equal of the plans the School Board considered and, unlike Citizen 2, there is nothing irregular or unusual in the shape of its regions.

In any event, the School Board in fact showed that the minor population deviation in Administration 2 was justified by legitimate policy objectives. In *Karcher*, the Supreme Court specifically recognized that small deviations in population are constitutional despite a more equal plan where the selection of the less equal reapportionment plan is based on such policies as "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent[s]." 462 U.S. at 740, 103 S.Ct. 2653. Here, the legitimate policies of compactness and preserving the core of the existing regions justified Administra-

tion 2 against the only more mathematically equal plan, Citizen 2.

*Section 303(b)(3) Of The Public School Code*

Section 303(b)(3) of the Public School Code provides that where school directors are elected by regions, "[t]he boundaries of the regions shall be fixed and established in such manner that *the population of each region shall be as nearly equal as possible* and shall be compatible with the boundaries of election districts."[3] 24 P.S. § 3–303(b)(3) (emphasis added).

■■■ Whether a plan complies with Section 303(b)(3)'s requirement that population be "as nearly equal as possible" turns "on the particular facts of each situation, rather than on strict mathematical formulae." *Petition to Reapportion Chichester School District*, 688 A.2d at 1278; *see also In re Plan for the Division of Chichester School District into Nine Regions*, 210 Pa.Super. 426, 234 A.2d 187, 190–91 (1967). In making that determination, "[t]he proper judicial approach is to ascertain whether, under the particular circumstances existing ... there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." *Petition to Reapportion Chichester School District*, 688 A.2d at 1279 n. 8 (quoting *Plan for Division of Chichester School District* and *Butcher v. Bloom*, 415 Pa. 438, 203 A.2d 556 (1964)) (emphasis omitted); *Plan for Division of Chichester School District*, 234 A.2d at 191 (quoting *Butcher v. Bloom*). Federal Equal Protection Clause standards apply in determining whether a plan violates Section 303(b)(3)'s requirement that population be

---

3. There is no dispute that Administration 2, Citizen 1 and Citizen 2 all satisfy Section 303(b)(3)'s requirement of compatibility with election district boundaries.

"as nearly equal as possible." *In re Petition of the Board of Directors of the Hazleton Area School District*, 105 Pa.Cmwlth. 565, 524 A.2d 1083, 1085–86 (1987); *see also Reapportionment of Township of Haverford*, 873 A.2d at 828, 836 & n. 27 (state requirement that local government districts be "as nearly equal in population as practicable" imposes same standard as federal Equal Protection Clause).

 Legitimate public policies outside of Section 303(b)(3), such as preserving municipal boundaries and avoiding disruption to the community and incumbents, cannot override high population disparities where significantly greater population equality is possible. *Petition to Reapportion Chichester School District*, 688 A.2d at 1278–80 (public policies outside the statute could not be considered in determining whether 68% population deviation was "as nearly equal as possible"); *In re Consolidation of Election Regions*, 104 Pa. Cmwlth. 328, 522 A.2d 667, 669–71 (1987) (approval of plan with a 23% deviation over plan with a 5% deviation violated requirement that population be "as nearly equal as possible" and could not be justified on grounds of preserving municipal boundaries). Where the population deviations are small, however, a plan with greater population disparity than the minimum possible still satisfies the "nearly equal as possible" requirement, if the deviations advance rational and legitimate policies. *Hazleton Area School District*, 524 A.2d at 1085–86 (trial court could consider policy justifications in determining whether plan with 8.7% maximum deviation from ideal population and 16% maximum deviation between most and least populous regions satisfied "nearly equal as possible" requirement); *Resident Electors of Abington Heights School District v. Abington Heights School Board of Abington Heights School District*, No. 99 CV 5343, 2003 WL 25300070, at *5, *11–*15 & n. 45 (C.P. Lackawanna Co. January 31, 2003) (plan

with 11.39% maximum deviation satisfied "as nearly equal as possible" requirement even though school board had developed a different plan with a slightly lower disparity that it had rejected on the grounds, *inter alia*, that it had one disproportionately geographically large region); *In re Petition of Central Bucks School District*, 23 Pa. D. & C.4th 53, 54–55, 57–60 (C.P. Bucks Co.1995) (plan with 12.57% maximum deviation from ideal and 25% maximum deviation between most and least populous regions satisfied "as nearly equal as possible" requirement, even though other plans submitted without adequate signature support had lower population disparity).

 As discussed above, the population deviations in Administration 2 are very small, less than 2% from ideal region population and less than a 3% deviation of between most and least populous regions. These minor inequalities are considerably less than in the only other plan submitted to the court for approval, Citizen 1, which has a maximum deviation from ideal region population of 4.65% and a deviation of 7.44% between most and least populous regions. The trial court found that the slight population inequality in Administration 2 was due to maintaining continuity with the existing regions and was not the result of any arbitrariness or discrimination. (November 21, 2012 Trial Court Op. at 8.) That finding is supported by the evidence at the hearing. (H.T. at 49, 74–79, R.R. at 111a, 136a–141a; Exhibit SB–1 Tab 1, R.R. at 23a–24a). The purpose of maintaining continuity is a legitimate justification for minor deviations from population equality. *Karcher*, 462 U.S. at 740, 103 S.Ct. 2653; *Holt v. 2011 Legislative Reapportionment Commission*, —— Pa. ——, ——, 67 A.3d 1211, 1234–36 (2013). The trial court therefore did not err in holding that Administration 2 satisfies the

requirement that population be "as nearly equal as possible."

CROP's only basis for contending that that Administration 2 does not satisfy Section 303(b)(3) is that Citizen 2 showed that it is possible to achieve even lower population deviations if considerations of reasonableness in the size and shape of the regions are disregarded. The trial court correctly rejected this argument. Citizen 2 was not supported by any petition of electors. Section 303(b)(2) requires that for a regional representation plan not proposed by the school board to be considered, it must be submitted by "[e]lectors equal to at least twenty-five (25) per centum of the highest vote cast for any school director in the last municipal election." 24 P.S. § 3-303(b)(2). Because Citizen 2 did not comply with this requirement, it was not properly before the trial court and is not properly before this Court. *Hazleton Area School District*, 524 A.2d at 1084 n. 2. While parties who are not statutorily permitted to submit reapportionment plans to the court for approval may introduce alternative plans as evidence, *see, e.g., Holt v. 2011 Legislative Reapportionment Commission*, 614 Pa. 364, 392–400, 38 A.3d 711, 728–33 (2012), the Public School Code provided CROP with a procedure to submit alternative plans and CROP did not comply with respect to Citizen 2, opting instead to submit only its less equal Citizen 1 plan.

Moreover, Section 303(b)(3)'s requirement that population be "as nearly equal as possible" does not invalidate school district representation plans with only minimal population deviations simply because it is mathematically possible to reduce deviations even further by assembling misshapen regions that no one puts forth as a suitable plan. In *Reapportionment of Township of Haverford*, this Court held that a reapportionment plan with a 9.52% maximum deviation between township commissioner wards satisfied state constitutional and statutory requirements that districts be "as nearly equal in population as practicable" because that population deviation was under 10%, even though there was evidence that a much lower 3.17% maximum deviation could be achieved under a different plan. 873 A.2d at 825–28, 833–37. There is no material difference between the language "as nearly equal in population as practicable" interpreted in *Reapportionment of Township of Haverford* and Section 303(b)(3)'s requirement that "the population of each region shall be as nearly equal as possible," as the terms "practicable" and "possible" are synonyms. *See, e.g., Webster's Third New International Dictionary Unabridged* 1771, 1780 (2002). Here, the population difference is far lower than that upheld in *Reapportionment of Township of Haverford*. As the trial court aptly concluded, the marginal reduction in inequality from Citizen 2 in comparison to Administration 2 is *de minimis*. (November 21, 2012 Trial Court Op. at 8.)

*The Trial Court's Approval Of Administration 2 Over Citizen 1*

Because both Administration 2 and Citizen 1 meet the requirements of the Public School Code, the trial court could properly consider legitimate factors outside statutory requirements in determining which of those plans would best serve the School District. *Octorara Area School District*, 722 A.2d at 771; *Petition to Reapportion Chichester School District*, 688 A.2d at 1280. Section 303 of the Public School Code, by providing for choices of at-large, three-region and nine-region representation, does not express a preference for one of these types of plans over the others. *Octorara Area School District*, 722 A.2d at 769.

The trial court held that Administration 2 would better serve the School District than Citizen 1 for three reasons. First, the court concluded that Administration 2 was the better alternative because it maintained School District's existing region configuration, whereas Citizen 1 contained "irregular and contrived regions that are not natural combinations of precincts." (November 21, 2012 Trial Court Op. at 9–10; February 6, 2013 Trial Court Supplemental Op. at 3.) Second, the court found that Administration 2 would be less disruptive because it moved only three election districts to another region whereas Citizen 1 would force out three incumbent School Board directors. (November 21, 2012 Trial Court Op. at 10; February 6, 2013 Trial Court Supplemental Op. at 3.) Third, the trial court found that Administration 2 would also be less disruptive because its three regions could better absorb future population changes without becoming unequal than the much smaller regions in Citizen 1. (November 21, 2012 Trial Court Op. at 11; February 6, 2013 Trial Court Supplemental Op. at 3.)

■ All of these factors are legally valid grounds for approving one school district reapportionment plan that complies with the Public School Code over another. Whether a plan is less disruptive to the community and to incumbent school district directors can be considered in determining which of two statutorily compliant plans should be approved. *Petition to Reapportion Chichester School District,* 688 A.2d at 1280. Preservation of existing regions and preference for compactness over irregularly shaped regions are also legitimate factors that may be considered in reapportionment decisions. *Karcher,* 462 U.S. at 740, 103 S.Ct. 2653; *Holt,* ⎯ Pa. at ⎯, 67 A.3d at 1234–36.

CROP argues that the trial court failed to consider that a nine-district plan would increase representative democracy. (Appellant's Br. at 36–41.) The trial court, however, did consider this argument and rejected it because under Citizen 1, six of the nine School Board directors could still come from one municipality. (November 21, 2012 Trial Court Op. at 10.) This finding is supported by the record. CROP's witness testified that under Citizen 1, six of the nine regions could be represented by residents of Falls Township, and admitted that Citizen 1 "does nothing to improve the possibility that there could be a concentration from one municipality" on the School Board. (H.T. at 201–02, R.R. at 264a–265a.)

■ CROP also argues that the trial court's consideration of future population growth was improper. (Appellant's Br. at 41–47.) We do not agree. The requirement that only existing population data may be considered applies to the determination of whether a plan satisfies Section 303(b)(3)'s requirement that the regions be "as nearly equal as possible." *In re Division of Spring–Ford Area School District,* 210 Pa.Super. 338, 234 A.2d 184, 187 (1967); *Central Bucks School District,* 23 Pa. D. & C.4th at 59–60. The trial court considered the effect of future population growth solely on the issue of future long-term stability in choosing between Administration 2 and Citizen 1, not in deciding whether the plans presently comply with Section 303(b)(3). (November 21, 2012 Trial Court Op. at 11 n.8; February 6, 2013 Trial Court Supplemental Op. at 2–3.) There is nothing improper in considering the effect of future population changes in determining which of two compliant plans is more likely to be stable and therefore better serves the interest of a school district.

Because the trial court correctly applied the law and properly exercised its discretion in concluding that the School Board's Administration 2 plan satisfies all constitu-

tional and statutory requirements and best serves the interest of the School District, we affirm the trial court's order.

## ORDER

AND NOW, this 8th day of November, 2013, the order of November 21, 2012 of the Court of Common Pleas of Bucks County in the above-captioned case is AFFIRMED.

